**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| FOREFRONT MANAGEMENT, LLC,<br>FOREFRONT DERMATOLOGY -<br>EAST PROFESSIONAL, LLC, and<br>FOREFRONT PHYSICIANS HOLDINGS,<br>LLC, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: |
| | ) | |
| v. | ) ) | |
| IRENE J. VERGILIS-KALNER,<br>ARKADY KALYUZHNY (a/k/a ALEC<br>KALNER), and SKIN CANCER &<br>AESTHETIC SURGERY, P.C., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Forefront Management, LLC ("Forefront Management"), Forefront Dermatology – East Professional, LLC ("Forefront East"), and Forefront Physicians Holdings, LLC ("Forefront Holdings") (together, "Plaintiffs" or "Forefront"), by their undersigned counsel, as and for their Complaint, state as follows:

## Nature Of The Case

1. This Complaint arises out of a multi-victim fraudulent scheme perpetrated by Defendants.

2. Defendant Irene Vergilis-Kalner ("Dr. Vergilis") is a dermatologist who started and ran Defendant Skin Cancer & Aesthetic Surgery, P.C. ("SCAS").

3. Dr. Vergilis and her husband, Arkady Kalyuzhny a/k/a Alec Kalner ("Kalner"), ran SCAS for years as an enterprise that engaged in a scheme to defraud Medicare and third-party

insurance companies by billing them for dermatological services and procedures that were not rendered or were not medically necessary.

4. But Dr. Vergilis and Kalner did not stop there.

5. They caused SCAS to book the fraudulently received payments as if they were legitimate. This made SCAS look—on paper—like it was an extremely profitable business when, in reality, it was a house of cards built on fraudulent revenues and profits.

6. Dr. Vergilis and Kalner then utilized their fraudulently obtained revenues and profits to induce Forefront Management into purchasing SCAS without ever informing Forefront Management about the prior fraud scheme.

7. In November 2022, Plaintiffs, certain of their affiliates, Dr. Vergilis, and SCAS entered into an Asset Purchase Agreement pursuant to which Plaintiffs acquired SCAS's assets.

8. Dr. Vergilis and SCAS received nearly $25 million in cash and equity for the purchase.

9. After the purchase, Dr. Vergilis remained with the business as an employee of Forefront East, and Kalner remained with the business as an employee of Forefront Management.

10. But after the purchase, Plaintiffs discovered for the first time that SCAS was a sham propped up by the fraudulent scheme that Dr. Vergilis and Kalner orchestrated.

11. When Plaintiffs discovered the fraud, they promptly investigated and repaid substantial sums to Medicare.

12. Plaintiffs also terminated the employment of Dr. Vergilis and Kalner.

13. But without the fraudulent billing scheme, the house of cards collapsed. The business that Plaintiffs had acquired was essentially worthless and could not continue as a going concern.

14.     Plaintiffs were forced to wind it up and, in the process, pay substantial sums to various third parties.

15.     As a result, Plaintiffs bring this Complaint against Defendants for their violations of the federal Racketeer Influenced And Corrupt Organizations ("RICO") laws, breaches of contract and fiduciary duties, and other wrongful acts and conduct.

## The Parties

16.     Plaintiff Forefront Management is a Delaware limited liability company.

17.     Plaintiff Forefront East is a New Jersey limited liability company qualified to do business in New York.

18.     Plaintiff Forefront Holdings is a Delaware limited liability company.

19.     Defendant Dr. Vergilis is an individual and resident of New York.

20.     Defendant Kalner is an individual and resident of New York.

21.     Dr. Vergilis and Kalner are a married couple.

22.     Defendant SCAS is a New York professional services corporation.

## Jurisdiction And Venue

23.     This Complaint alleges RICO violations.  The RICO statute expressly grants aggrieved private parties a cause of action in the district courts of the United States. 18 U.S.C. § 1964(a), (c).  Thus, this case presents a federal question over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

24.     This Court has supplemental jurisdiction to adjudicate Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Dr. Vergilis and Kalner because they are residents of New York.

26.    This Court has personal jurisdiction over SCAS because it is a New York corporation.

27.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants are residents of New York and a substantial part of the events or omission giving rise to Plaintiffs' claims occurred in New York.

## General Allegations

### Plaintiffs And Their Business

28.    Plaintiff Forefront Management acquires and manages dermatology practices that are comprised of leading physicians in the practice of dermatology.

29.    Those practices provide patients with medical and cosmetic dermatological services and products.

30.    Forefront Management manages more than 240 independent locations across twenty-eight states.

31.    Plaintiff Forefront East operates several dermatology locations in New Jersey.

32.    Plaintiff Forefront Holdings is one of the indirect parent companies of Forefront Management.

### Dr. Vergilis, Kalner, And SCAS

33.    Dr. Vergilis is the holder of New York physician's license number 256563, which she obtained on or around March 23, 2010.

34.    Dr. Vergilis formed SCAS on or around April 11, 2011.

35.    SCAS held itself out as a dermatology practice, and Dr. Vergilis practiced there until she sold SCAS to Forefront Management and Forefront East in November 2022.

36.     At some point before 2022, Kalner started working for SCAS as its Practice Administrator.

37.     SCAS started as one clinic, and it grew to five clinics, all of which were in New York City, with two in Brooklyn and one each in Manhattan, Queens, and Staten Island.

38.     SCAS employed several other healthcare providers, including nurse practitioners.

39.     Dr. Vergilis saw and treated SCAS's patients, performed dermatological services and procedures, and prescribed medications.

40.     Dr. Vergilis and Kalner each directed the affairs of SCAS.

41.     Dr. Vergilis supervised the nurse practitioners.

42.     Further, Dr. Vergilis and Kalner both supervised SCAS's office staff, including the staff members responsible for billing.

43.     Dr. Vergilis and Kalner directed SCAS's nurse practitioners regarding how they charted and coded, as described below.

44.     Kalner was the SCAS employee primarily responsible for its billing.  He was responsible for operating its billing software and submitting bills and the required information to Medicare, Medicaid, and the insurance companies that were responsible for paying for SCAS's medical services.

**Medical Billing And Coding**

45.     The fraudulent scheme that Defendants perpetrated involved fraudulent billing practices and the fraudulent manipulation and utilization of billing codes.

46.     Many health care providers in the United States seek and obtain payments for their services not from their patients directly, but from third parties like insurance companies, Medicaid, or Medicare.

47.    Healthcare providers seek payments from these third-party payers by submitting bills or "claims" via electronic portals maintained by the third party.

48.    The claims set forth information about the services and procedures for which the provider is seeking payment.

49.    To make the billing process more efficient and uniform nationwide, healthcare providers use a series of uniform codes on the claims to notify the payers about the services and procedures performed.

50.    The codes were developed and promulgated for this purpose.

51.    The American Medical Association developed one set of uniform codes called "CPT codes" that healthcare providers utilize.

52.    Each task or service that a healthcare provider can provide is assigned its own unique CPT code.

53.    For example, CPT code 99214 is for an office visit.  CPT code 90658 is for the administration of a flu shot.

54.    In all, there are thousands of CPT codes that cover the significant ranges of tasks and services that healthcare providers can provide.

55.    The World Health Organization also developed a set of uniform codes referred to as "ICD codes."

56.    Healthcare providers use ICD codes to represent patient diagnoses.

57.    In all, there are thousands of ICD codes.

58.    After a patient visit, a healthcare provider (or his or her practice) will assign a code or codes to the services, procedures, tests, or evaluations that he or she provided to or ordered for the patient.

59.     Those codes will, in turn, be set forth on the claim that is submitted to the third-party payer for payment.

60.     Thus, each bill or claim is a representation by the provider (and the provider's practice) to the third-party payer that: (a) services, procedures, tests, or evaluations corresponding to the code or codes were performed on, or rendered for the benefit of, the patient; (b) those services, procedures, tests, or evaluations were medically necessary.

61.     Whether payment will be approved and, if so, in what amount is determined in part by the codes that are set forth on the claim.

**SCAS's Billing Process**

62.     SCAS employed a multi-step billing process pursuant to which it prepared bills that contained standardized billing codes, submitted them to third-party payers, and then received payments.

63.     SCAS utilized an Electronic Health Records ("EHR") system called "EMA."

64.     Within the EHR system, SCAS maintained a digital "chart" for each patient.

65.     The digital charts were akin to paper charts and included information about the patient, each visit, diagnoses, procedures performed, and prescriptions, among other things.

66.     During or after a visit in which an SCAS clinician saw a patient, the clinician would access the patient's chart within the EHR system.

67.     The clinician would input information into the patient's chart regarding the visit, including: (a) the patient's symptoms and diagnoses; (b) what tests, surgeries, evaluations, or procedures were performed (if any); and (c) whether any medications were prescribed.

68.     While the clinician was updating a patient's chart in the EHR system, the system would automatically suggest codes that could apply to the tests, surgeries, evaluations, or procedures that the clinician was inputting.

69.     SCAS's clinicians selected a code or codes before closing the chart in the EHR system.

70.     When the clinician closed the chart in the EHR system, the system automatically and electronically transferred the codes and other information to SCAS's billing platform.

71.     SCAS then used its billing platform to generate claims to the third-party payers.

72.     SCAS submitted those claims electronically, and the insurance companies and other payers submitted payment to SCAS electronically or via checks sent in the mail.

73.     Kalner supervised the billing process for SCAS.

**The Fraudulent Scheme**

74.     Dr. Vergilis and Kalner used SCAS to perpetrate a fraudulent medical billing scheme pursuant to which they submitted false claims to third-party payers to seek payment for claims or services that were never provided or that were medically unnecessary.

75.     Via this scheme, Dr. Vergilis and Kalner caused SCAS to fraudulently obtain unearned and unwarranted revenues from third-party payers.  They then used those fraudulently obtained funds to artificially inflate SCAS's revenues and profits and to induce Forefront Management and Forefront East to purchase SCAS at an inflated price.

76.     In that regard, the scheme had two goals. The first goal was to obtain funds from third-party payers by making false and inflated claims to them.

77.     The second goal was to falsely and artificially increase SCAS's revenues and profits as measured by its net profits or "EBITDA," (*i.e.*, earnings before interest, taxes,

depreciation, and amortization).

78.     Dr. Vergilis and Kalner planned to sell SCAS, and they knew that buyers of medical and dermatology practices often calculated the purchase price they were willing to pay by multiplying the business's EBITDA by a "multiplier." In that sense, the buyer would calculate the purchase price by reference to a future profit stream.

79.     Thus, Dr. Vergilis and Kalner knew that every dollar that SCAS could obtain fraudulently from a third-party payer would increase SCAS's EBITDA on paper and, in turn, yield additional dollars in the form of an artificially inflated sales price that was based on a multiple of SCAS's putative EBITDA.

80.     Dr. Vergilis and Kalner fraudulently generated revenues through multiple fraudulent charting and billing methods. Examples of several specific methods are alleged below.

81.     In each instance, SCAS submitted claims with false codes to third-party payers, including Medicare and Medicaid.

82.     As explained and alleged further below, Forefront Management and Forefront East would not have acquired SCAS or employed Dr. Vergilis or Kalner had they known about the fraudulent charting and billing methods or that the revenues and profits derived from them were not properly obtained.

**Method One—Coding Multiple Procedures in One Visit**

83.     Dr. Vergilis and Kalner falsely claimed that more procedures were conducted on a patient in a particular visit than were performed and, thus, obtained an unearned payment.

84.     For example, Dr. Vergilis performed a procedure for a patient on one skin lesion.

85.     However, she updated the patient's chart in the EHR system to state that she had treated multiple skin lesions for the patient.

86.     Dr. Vergilis then entered codes for the visit to state that she had performed multiple procedures when she had performed only one.

87.     When she coded the visit as multiple procedures, Dr. Vergilis knew that she had not performed each procedure and that the codes she entered were false.

88.     Dr. Vergilis used this method repeatedly to enter multiple false codes that were used to make multiple false claims to third-party payers.

89.     In at least one instance, she entered codes stating that she had performed fifteen or more different procedures in a visit when she had performed just one.

**Method Two—Duplicative Procedures Across Two Visits**

90.     Another fraudulent billing method involved:  (a) conducting a procedure on a patient during a visit; (b) billing a third-party payer for the procedure; and (c) then billing the payer again about a week later for the same procedure.

91.     To utilize this method, Dr. Vergilis saw a patient and performed a procedure like a wart or mole removal.  She updated the patient's chart in the EHR system to indicate that a procedure was conducted and selected the code for that procedure.

92.     Then, approximately a week later, Dr. Vergilis again updated the patient's chart to indicate that she had conducted the very same procedure.  She again selected the same code for it.

93.     When she updated the patient's chart in the EHR system and selected the code for each duplicative procedure, Dr. Vergilis knew that she had not performed the duplicative procedure or, if she did perform it, that it was not medically necessary.  As a result, she knew that the codes she entered were false.

94.     Dr. Vergilis used this method repeatedly to enter multiple false codes that were submitted on multiple false claims to third-party payers.

## Method Three—Churning Patient Visits Via Diagnosis "Cycling"

95.     Another fraudulent billing practice involved cycling between two diagnoses in an a-b-a-b pattern for the same patient in one-week intervals.

96.     For example, Dr. Vergilis saw a patient and diagnosed the patient with having a specific type of rash.

97.     She updated the patient's chart in the EHR system to indicate that she conducted an office visit or examination, set forth the diagnosis, and provide for the applicable codes.

98.     The week after the initial visit, Dr. Vergilis updated the patient's chart again to indicate that there was a subsequent visit.

99.     But for this subsequent visit, Dr. Vergilis logged a different diagnosis in the EHR system and entered codes that corresponded to it.

100.     The following week, Dr. Vergilis updated the patient's chart a third time and used the diagnosis from the first week.  She also entered codes that corresponded to week one's diagnosis.

101.     Then, in the fourth week, Dr. Vergilis updated the patient's chart a fourth time and used the diagnosis from the second week.  She also entered codes that corresponded to week two's diagnosis.

102.     Dr. Vergilis repeatedly based EHR entries and the corresponding codes on this pattern of cycling diagnoses one week apart in an a-b-a-b pattern.

103.     She even utilized cycles of ten to twelve weeks where, each week, the patient's symptoms would alternate between the same two diagnoses.

104.     It is not clear to Plaintiffs whether Dr. Vergilis made up fictional visits or had the same patient return for multiple visits but, whichever was the case, Dr. Vergilis's "cycling" was

fraudulent. If the patients were not returning, then the visits and diagnoses were outright fabrications. If the patients were returning each week, then the weekly visits were not medically necessary, and Dr. Vergilis alternated the diagnoses to make sure the claims were not denied.

105. When she updated the patient's chart in the EHR system and selected the code for each "cycled" diagnosis, Dr. Vergilis knew that the diagnoses and need for a visit were false. She also knew that one or both of the putative diagnoses were false, as were any corresponding codes. As a result, she knew that codes she entered were false.

106. Dr. Vergilis used this fraud method repeatedly to enter multiple false codes that were used to make multiple false claims to third-party payers.

**Method Four—Churning Acne Patients**

107. Another fraudulent billing practice Dr. Vergilis and Kalner employed was to churn bills for acne patients via unnecessary follow-up visits and procedures.

108. Typically, after an initial visit, an acne patient will be seen once per month for a few months and then every three, six, or twelve months as needed.

109. Visits at a frequency of once per week are not medically necessary for acne.

110. But Dr. Vergilis updated charts in the EHR system indicating that she was seeing acne patients once per week. She also input codes corresponding to these weekly examinations.

111. Dr. Vergilis also updated charts in the EHR system and entered corresponding codes indicating that she performed frequent procedures like acne surgery and intralesional Kenalog catalog injections for minor acne lesions.

112. It is rare that these procedures are required for acne, yet Dr. Vergilis frequently entered codes for them via the EHR system.

113.    It is not clear to Plaintiffs whether Dr. Vergilis made up fictional visits or performed unnecessary procedures on patients but, whichever was the case, the codes were fraudulent.  If she did not perform the procedures, the entries were fabrications.  If she did, they were not medically necessary.

114.    When Dr. Vergilis updated the patient's chart in the EHR system and selected the code for each acne visit or procedure, she knew that the visit and procedure had either not occurred or were medically unnecessary.  As a result, she knew that codes she entered were false.

115.    Dr. Vergilis used this fraud method repeatedly to enter multiple false codes that were used to make multiple false claims to third-party payers.

**Method Five—Changing Codes In The Billing System**

116.    The next method of fraud was that Kalner changed or "upcoded" billing codes and then issued claims based on the altered codes to obtain payment where SCAS would not have been entitled to payment or would have been entitled to a lower payment.

117.    Upcoding occurs when a provider submits a claim to an insurer or claims administrator utilizing an inaccurate billing code to obtain higher payment. The provider uses the billing code to deceive the insurer or claims administrator into overpaying by misrepresenting the type or degree of services rendered.

118.    Kalner, in his role as SCAS's Practice Administrator, was responsible for submitting claims to payers on behalf of SCAS.

119.    To do this, Kalner utilized SCAS's billing platform.

120.    After a clinician closed a patient chart in the EHR system, the codes from the chart were automatically imported into the billing platform.

121.    The platform allowed Kalner to review the codes, change them if he desired, and then issue claims containing the codes to the third-party payer responsible for payment on behalf of the patient.

122.    Before submitting claims, Kalner would review the codes that were imported into SCAS's billing system from its EHR system.

123.    Kalner routinely changed codes to increase the payments SCAS would receive where the increase (or any payment at all) was unearned or unwarranted.

124.    For example, Kalner routinely changed CPT code 99213 (for an established patient office visit of 20-29 minutes) to 99214 (for an established patient office visit of 30-39 minutes) to obtain unwarranted payments from third-party payers.

125.    Kalner knew that if SCAS submitted CPT code 99213, the claim would be denied and SCAS would not receive payment.

126.    So Kalner changed that code to 99214, for which he knew SCAS would receive payment.

127.    Kalner later admitted to a Forefront representative that he made this change because SCAS would not receive payment under the original code and would receive payment under the changed code.

128.    Kalner also routinely changed CPT code 17110 (for removal of fourteen or fewer lesions) to code 17111 (for removal of fifteen or more lesions).

129.    Kalner did this on multiple occasions even though the chart in the EHR system indicated that just one or two lesions were removed.

130.    Kalner knew that the changed codes he entered were false.

131.    Kalner used this fraud method repeatedly to enter multiple false codes that were used to make multiple false claims to third-party payers.

**Other Methods**

132.    The foregoing five methods are just examples. Dr. Vergilis, Kalner, and other SCAS clinicians acting at their direction submitted false claims in other ways as well.

133.    For example, several EHR charts and the corresponding claims included the exact same number of lesions and body sites for the destruction of warts, which indicated that the SCAS clinician was using a template to push a chart and claims through the EHR and billing system.

134.    As another example, clinicians altered charts to indicate that medications were prescribed.  The prescription caused the EHR system to include higher coding levels than otherwise would have bene suggested, which in turn increased the value of the claim submitted to the third-party payer.  But there are no records of the prescription being called into a pharmacy.

**Other SCAS Clinicians Entered False Codes**

135.    Dr. Vergilis instructed SCAS's other clinicians to enter false and incorrect codes into the EHR system.

136.    The other clinicians followed her instructions and routinely entered false and incorrect codes.

**The False Billing Codes Resulted In Knowingly Fraudulent Revenues For SCAS**

137.    Dr. Vergilis, Kalner, and other SCAS employees acting at their direction entered the false codes and other information into SCAS's EHR system or billing platform with the intent of obtaining revenues for services, examinations, and procedures that SCAS had not performed or that it performed unnecessarily to earn an unwarranted payment.

138. Dr. Vergilis knew that the false codes she input in the EHR system would be transferred to SCAS's billing platform, that Kalner would approve them, that they would be submitted on claims to third-party payers, and that the third-party payers would pay the claims.

139. She also knew that the false codes SCAS's other clinicians input in the EHR system would be transferred to SCAS's billing platform, that Kalner would approve them, that they would be submitted on claims to third-party payers, and that the third-party payers would pay the claims.

140. After each false entry made in the EHR system, that system transferred the codes to SCAS's billing platform.

141. Kalner then approved of the codes in the billing system and caused SCAS to issue claims to third-party payers like insurance companies.

142. The claims were submitted electronically over the internet to online portals set up by the third-party payers.

143. The submission of claims by SCAS constituted communications transmitted by wire.

144. The claims represented to each third-party that the codes accurately reflected the services, examinations, and procedures that SCAS provided to the patient and that they were medically necessary.

145. Those claims were fraudulent because they contained the false representation that SCAS had performed procedures that it did not perform and that the procedures it did perform were medically necessary.

146. Dr. Vergilis, Kalner, and SCAS's clinicians knew and intended that the claims contained false representations.

147. The third-party payers subsequently paid SCAS based on the false claims.

148.     The payers submitted the payments electronically or via the mail.

149.     SCAS is an enterprise that was engaged in and whose activities affected interstate commerce.

150.     From at least 2019 to November 2022, SCAS received millions of dollars from third-party payers because of the fraudulent billing scheme.

151.     Dr. Vergilis and Kalner utilized this fraudulent billing scheme on thousands of claims.

152.     Dr. Vergilis and Kalner caused SCAS to submit fraudulent claims to Medicare and other third-party payers, including Fidelis Care, Empire BlueCross Blue Shield, Healthfirst, United Healthcare, and Aetna.

153.     Based on Plaintiffs' investigation to date, they estimate that over 20% of SCAS's billings were tainted with fraud.

154.     As a result, the fraudulent billing scheme was part of SCAS's routine way of doing business from at least 2019 through November 2022.

**Examples Of The Fraudulent Practices Before November 2022**

155.     The following are additional examples of Defendants' fraudulent billing that occurred before November 23, 2022.

**Example One**

156.     On March 1, 2022, SCAS clinician Viktoriya Fridman treated a patient with the initials C.H. ("Patient 1").

157.     Patient 1 sought treatment for two skin lesions.

158.     The SCAS clinician removed the two lesions.

159.    The clinician entered CPT code 54056 (for destruction of lesions, simple) into the EHR system.

160.    On March 6, 2022, Kalner added CPT code 17111 (for removal of fifteen or more lesions).

161.    Kalner then caused SCAS to send a claim or bill to Fidelis Care New York.

162.    The bill falsely represented that SCAS had treated Patient 1 on March 1, 2022 by removing fifteen or more lesions.

163.    Fidelis Care New York paid the claim.

164.    As a result, this false claim fraudulently increased SCAS's revenues.

**Example Two**

165.    On March 10, 2022, SCAS clinician Mariya Fuzaylova treated a patient with the initials N.K. ("Patient 2").

166.    Patient 2 sought treatment for skin lesions located on the right upper back and abdomen.

167.    The clinician entered CPT code 17110 (for removal of up to fourteen lesions) and CPT code 17000 (for removal of benign or premalignant lesions) into the EHR system.

168.    On March 17, 2022, Kalner changed: (a) CPT code 17110 to 17111 (for removal of fifteen or more lesions); and (b) CPT code 17000 to 17004 (for removal of fifteen or more benign, premalignant, or malignant lesions).

169.    Kalner then caused SCAS to send a claim or bill to Fidelis Care New York.

170.    The bill falsely represented that SCAS had treated Patient 2 on March 10, 2022 by removing fifteen or more lesions that were benign, premalignant, or malignant.

171.    Fidelis Care New York paid the claim.

172.    As a result, this false claim fraudulently increased SCAS's revenues.

**Example Three**

173.    On January 6, 2022, SCAS clinician Yelena Terushkin treated a patient with the initials N.Y. ("Patient 3").

174.    Patient 3 sought treatment for lesions located on the left cheek.

175.    The clinician entered CPT code 99213 (for mid-level patient visit) into the EHR system.

176.    On March 1, 2022, Kalner changed the CPT code from 99213 to 99214 (for moderately complex patient visit).

177.    Kalner also added CPT code 17111 (for removal of fifteen or more lesions).

178.    Kalner then caused SCAS to send a claim or bill to Healthfirst New York.

179.    The bill falsely represented that Patient 3's visit was moderately complex and that SCAS had treated Patient 3 on January 6, 2022 for fifteen or more lesions.

180.    Healthfirst New York paid the claim.

181.    As a result, this false claim fraudulently increased SCAS's revenues.

**Example Four**

182.    On January 13, 2022, SCAS clinician Yelena Terushkin treated a patient with the initials N.Y. ("Patient 4").

183.    Patient 4 sought treatment for skin lesions located on her left cheek.

184.    The clinician entered CPT code 99213 (for mid-level patient visit) into the EHR system.

185.    On February 28, 2022, Kalner changed CPT code 99213 to 99214 (for moderately complex patient visit).

186. Kalner also added CPT code 17111 (for removal of fifteen or more lesions).

187. Kalner then caused SCAS to send a claim or bill to Healthfirst New York.

188. The bill falsely represented that Patient 4's visit was moderately complex and that SCAS had treated Patient 4 on January 13, 2022 for fifteen or more lesions.

189. Healthfirst New York paid the claim.

190. As a result, this false claim fraudulently increased SCAS's revenues.

**Example Five**

191. On May 3, 2022, Dr. Vergilis treated a patient with the initials L.K. ("Patient 5").

192. Patient 5 sought treatment for a skin lesion located on the chest.

193. Dr. Vergilis entered CPT code 17004 (destruction of 15 or more benign or premalignant lesions of the integumentary system) into the EHR system.

194. The claim was denied.

195. On July 1, 2022, Kalner added modifiers 59 and 79 to CPT code 17004 to indicate that these were separate lesions from the lesions treated during Patient 5's previous visit on April 26, 2022. They were not.

196. Kalner then caused SCAS to send a claim or bill to Fidelis Care New York.

197. The bill falsely represented that SCAS had treated Patient 5 on May 3, 2022 for lesions different than the lesions treated on April 26, 2022.

198. Fidelis Care New York paid the claim.

199. As a result, this false claim fraudulently increased SCAS's revenues.

**Example Six**

200. On September 22, 2022, SCAS clinician Maria Levin treated a patient with the initials A.G. ("Patient 6").

201.    Patient 6 sought treatment for a skin lesion located on the left hand.

202.    The clinician entered CPT code 99213 (for mid-level patient visit), 17110 (for removal of up to fourteen lesions), 17000 (for removal of benign or premalignant lesions), and 11900 (intralesional injections into up to seven lesions).

203.    On October 4, 2022, Kalner changed:  (a) CPT code 99213 to 99214 (for moderately complex patient visit); (b) CPT code 17110 to 17111 (for removal of fifteen or more lesions); (c) CPT code 11900 to 11901 (intralesional injections for more than seven lesions); and (d) CPT code 17000 to 17004 (for removal of fifteen or more benign, premalignant, or malignant lesions).

204.    Kalner then caused SCAS to send a claim or bill to Fidelis Care New York.

205.    The bill falsely represented that Patient 6's visit was moderately complex, and that SCAS had treated Patient 6 on September 22, 2022 for fifteen or more lesions and with injections for more than seven lesions.

206.    Fidelis Care New York paid the claim.

207.    As a result, this false claim fraudulently increased SCAS's revenues.

**Example Seven**

208.    On September 22, 2022, SCAS clinician Maria Levin treated a patient with the initials M.V. ("Patient 7").

209.    Patient 7 sought treatment for hair loss.

210.    The clinician entered CPT code 17110 (for removal of up to fourteen lesions) into the EHR system.

211.    On October 2, 2022, Kalner changed the CPT code from 17110 to 17111 (for removal of fifteen or more lesions).

212. Kalner then caused SCAS to send a claim or bill to Fidelis Care New York.

213. The bill falsely represented that SCAS had treated Patient 7 on September 22, 2022 by removing fifteen or more lesions.

214. Fidelis Care New York paid the claim.

215. As a result, this false claim fraudulently increased SCAS's revenues.

**Example Eight**

216. On March 23, 2021, SCAS clinician Viktoriya Fridman treated a patient with initials S.J. ("Patient 8").

217. Patient 8 sought treatment for subcutaneous growths. That treatment had a 10-day "global period." A global period is a pre-set amount of time that follows a procedure during which charges for post-procedure care are bundled into the fee or charge for the initial procedure. In other words, when a medical practice receives a payment for the initial procedure, included within that payment is payment for the post-procedure care that occurs or follows within the global period.

218. On March 30, 2021, SCAS clinician Viktoriya Fridman treated the same areas on Patient 8 with liquid nitrogen.

219. This second visit was within the 10-day global period that followed the first visit.

220. Ms. Fridman entered CPT code 99214 (for moderate complexity patient visit) and added modifiers 24 and 25 into the EHR system.

221. Modifier 24 is used to indicate that the procedure occurred within a global period of a prior procedure.

222. On April 19, 2021, modifier 24 was removed by a SCAS employee from CPT code 99214 so that SCAS could seek reimbursement for procedures performed within the global period that would otherwise not be eligible for reimbursement.

223.    SCAS then sent the claim or bill for the March 30 procedure to Fidelis Care New York.

224.    The bill falsely represented that SCAS had not treated Patient 8 within the 10-day global period.

225.    Fidelis Care New York paid the claim.

226.    As a result, this false claim fraudulently increased SCAS's revenues.

227.    Further, SCAS's records show that it saw Patient 8 weekly at times with the diagnosis "flip flopping" and for putative ailments that did not require weekly visits.

**Example Nine**

228.    On March 23, 2021, SCAS clinician Viktoriya Fridman treated a patient with initials N.B. ("Patient 9").

229.    Patient 9 sought treatment for acne.

230.    On March 30, 2021, within the 10-day global period, Dr. Fridman treated the same areas on Patient 9 with acne surgery.

231.    Dr. Fridman entered CPT code 99214 (for moderately complex patient visit) appending modifiers 24 and 25 into the EHR system.

232.    Again, modifier 24 is used to indicate that the procedure occurred within a global period of a prior procedure.

233.    On April 19, 2021, modifier 24 was removed from CPT code 99214 by a SCAS employee so that SCAS could seek reimbursement for procedures performed within the global period that would otherwise not be eligible for reimbursement.

234.    SCAS then sent a claim or bill for the March 30 visit to Fidelis Care New York.

235.    The bill falsely represented that SCAS had not treated Patient 9 within the 10-day global period.

236.    Fidelis Care New York paid the claim.

237.    As a result, this false claim fraudulently increased SCAS's revenues.

238.    SCAS also saw Patient 9 on a weekly basis for years even though weekly visits were unnecessary.  These visits generated fraudulent and unearned revenues.

**Example 10**

239.    On March 23, 2021, SCAS clinician Viktoriya Fridman treated a patient with initials A.B. ("Patient 10").

240.    Patient 10 sought treatment for acne. That treatment had a 10-day global period.

241.    On March 30, 2021, Dr. Fridman saw Patient 10 again.

242.    Dr. Fridman entered CPT code 99214 (for moderately complex patient visit) appending modifiers 24 and 25 into the EHR system.

243.    On April 19, 2021, modifier 24 was removed by a SCAS employee from CPT code 99214 so that SCAS could seek reimbursement for procedures performed within the global period that would otherwise not be eligible for reimbursement.

244.    SCAS sent the claim or bill for the March 30 visit to Fidelis Care New York.

245.    The bill falsely represented that SCAS had not treated Patient 10 within the 10-day global period.

246.    Fidelis Care New York paid the claim.

247.    As a result, this false claim fraudulently increased SCAS's revenues.

**Example 11**

248.　　On March 23, 2021, SCAS clinician Viktoriya Fridman treated a patient with initials L.M. ("Patient 11").

249.　　Patient 11 sought treatment for skin irritation. That treatment had a 10-day global period.

250.　　On March 30, 2021, Dr. Fridman saw Patient 11 again.

251.　　Dr. Fridman entered CPT code 17004 (destruction of 15 or more benign or premalignant lesions of the integumentary system), 96574 (photodynamic therapy procedure), and 11901 (intralesional injections for more than seven lesions) into the EHR system.

252.　　On May 27, 2021, modifiers 59 and 79 were added by a SCAS employee to CPT code 96574 and modifier 59 was added to CPT code 17004 to indicate that the lesions treated on March 30 were not the same lesions treated during Patient 11's previous visit on March 23, 2021. But that was not true. The same lesions were treated in both visits.

253.　　SCAS sent a claim or bill for the March 30 visit to Medicare of New York.

254.　　The bill falsely represented that SCAS had treated Patient 11 on March 30, 2021 for lesions different than the lesions treated on March 23, 2021.

255.　　Medicare of New York paid the claim.

256.　　As a result, this false claim fraudulently increased SCAS's revenues.

**Example 12**

257.　　On June 22, 2021, SCAS clinician Viktoriya Fridman treated a patient with initials D.G. ("Patient 12").

258.　　Patient 12 sought treatment for acne. That treatment had a 10-day global period.

259.　　On June 29, 2021, Dr. Fridman saw Patient 12 again.

260. Dr. Fridman entered CPT code 99214 (for moderately complex patient visit) appending modifiers 24 and 25 into the EHR system.

261. On October 5, 2021, Kalner removed modifier 24 from CPT code 99214 so that SCAS could seek reimbursement for procedures performed within the global period that would otherwise not be eligible for reimbursement.

262. SCAS sent the claim or bill for the June 29 visit to Fidelis Care New York.

263. The bill falsely represented that SCAS had not treated Patient 12 within the 10-day global period.

264. Fidelis Care New York paid the claim.

265. As a result, this false claim fraudulently increased SCAS's revenues.

**The Fraudulent Billing Substantially Increased SCAS's Putative Financial Performance**

266. As alleged above, the first step in Defendants' fraudulent scheme was to obtain fraudulently earned revenues from the third-party payers.

267. The next step in their scheme was to use those revenues to sell SCAS at an artificially inflated price.

268. SCAS booked the payments it received via the fraudulent scheme alleged above into its books and records as if they were ordinary, earned revenues when in fact the payments were fraudulently obtained.

269. Both Dr. Vergilis and Kalner knew that SCAS obtained the payments fraudulently and they did not reflect earned revenues by SCAS.

270. Dr. Vergilis and Kalner hired an accountant to prepare financial statements for SCAS for 2019, 2020, 2021, and 2022.

271.    They did not inform the accountant that SCAS had obtained millions of dollars of revenues in each of those years through a fraudulent billing scheme.

272.    Thus, the accountant prepared financial statements for SCAS for 2019, 2020, 2021, and 2022 that included the fraudulently obtained revenues as if they were legally and genuinely obtained.

273.    Dr. Vergilis and Kalner knew that the financial statements the accountant prepared were false because they treated fraudulently obtained revenues as genuinely earned revenues.

**Defendants Used The Fraudulent Revenues To Market SCAS**

274.    Next, Dr. Vergilis and Kalner caused SCAS to hire an investment bank to market SCAS for sale to potential buyers.

275.    Dr. Vergilis and Kalner provided the investment bank with the false financial statements that had been prepared by SCAS's accountant.

276.    Dr. Vergilis and Kalner provided the financial statements to the investment bank so that it could prepare marketing materials that touted SCAS's putative financial performance and make it more attractive to potential buyers.

277.    Dr. Vergilis and Kalner intended for the investment bank to distribute those marketing materials to potential buyers, and they intended for the buyers to rely on the false financial information regarding SCAS in the marketing materials.

278.    Just as Dr. Vergilis intended and instructed, the investment bank used the false financial statements prepared by SCAS's accountant to prepare marketing materials that it then distributed to potential buyers.

279.    In the first half of 2022, the investment bank contacted Forefront Management to gauge its interest in potentially acquiring SCAS.

280.     After Forefront Management executed an NDA, the investment bank provided marketing materials to it that contained false financial information regarding SCAS's financial performance.

281.     On information and belief, the investment bank also distributed the marketing materials to other potential buyers.

282.     The marketing materials provided to Forefront Management stated that in 2020 SCAS had:  (a) $5.0 million in net patient revenues; (b) $3.2 million in adjusted net income; and (c) an adjusted net income margin of 64.1%.

283.     Adjusted net income is a type of profit metric that is similar to EBITDA.

284.     The marketing materials provided to Forefront Management stated that in 2021 SCAS had:  (a) $7.52 million in net patient revenues; (b) $5.54 million in adjusted net income; and (c) an adjusted net income margin of 70.9%.

285.     After reviewing the marketing materials, Forefront Management was interested in acquiring SCAS.  Forefront Management was interested in a potential acquisition because of the profit margin and net income figures set forth in the marketing materials.

286.     Had Forefront Management known that SCAS had been engaging in a years-long fraudulent coding and billing scheme, it would not have been interested in a potential acquisition.

287.     Further, had SCAS's true financial performance—without the fraudulently obtained revenues and profits—been disclosed in the marketing materials, Forefront Management would not have been interested in a potential acquisition.

288.     Without the fraudulently obtained revenues, SCAS was not achieving much or any profits.

289.     SCAS's accurate revenue, profit, and profit margin figures would not have met Forefront Management's benchmarks for a potential acquisition.

290.     Nonetheless, based on the false and fraudulent figures set forth in the marketing materials, SCAS and Forefront Management moved into the due diligence phase of a potential acquisition.

291.     During due diligence, SCAS provided information to Plaintiffs so that they could attempt to assess whether SCAS had complied with various federal laws and regulations regarding coding and billing.

292.     To hide their fraudulent billing and coding practices, Dr. Vergilis and Kalner self-selected the materials that SCAS provided during due diligence to obscure and conceal their fraud.

293.     As a result, Plaintiffs did not discover the fraudulent billing and coding practices until much later.

294.     During due diligence, Dr. Vergilis and Kalner also provided Plaintiffs with updated SCAS financial information for the twelve-month period from June 2021 to June 2022.

295.     This financial information included revenues and profits that SCAS had obtained from fraudulent coding and billing practices during that period.

296.     The financial information stated that SCAS had $8 million in net patient revenues and $3.3 million in adjusted net income for the twelve-month period from June 2021 to June 2022.

297.     During the due diligence period, Plaintiffs and SCAS negotiated the purchase price for the purchase of SCAS.

298.     They ultimately agreed on a price that was approximately eight times the $3.3 million in adjusted net income for the twelve-month period from June 2021 to June 2022.

299.     At no point during the due diligence process or otherwise did Dr. Vergilis or Kalner

inform Plaintiffs that SCAS's putative revenue and profit figures for 2019, 2020, 2021, and 2022 included millions of dollars obtained via a fraudulent coding and billing scheme.

**The Asset Purchase Agreement And Its Key Terms**

300. Plaintiffs, certain of their affiliates, Dr. Vergilis, and SCAS entered into an Asset Purchase Agreement as of November 18, 2022 (the "Purchase Agreement"). A true and correct copy of the Purchase Agreement is attached hereto as Exhibit 1.

301. In the Purchase Agreement, Forefront Management and Forefront Holdings purchased certain of SCAS's assets. (Ex. 1, § 1.2(a).)

302. In exchange, Plaintiffs agreed to pay SCAS a total purchase price of $24,670,000, consisting of: (a) $19,670,000 in cash paid by Forefront Management; and (b) 50,000 Class B Common Units in Forefront Holdings representing a value equal to $5,000,000 that Forefront Holdings issued to SCAS. (*Id.* §§ 1.1, 1.5.)

303. In the Purchase Agreement, Dr. Vergilis and SCAS jointly and severally made multiple representations and warranties that SCAS was not engaging in improper coding or violating any related laws.

304. *First*, in Section 3.1(a), Dr. Vergilis and SCAS jointly and severally represented and warranted that: "in the six years prior to the Closing Date, Seller and Owner [*i.e.*, SCAS and Dr. Vergilis] and, to Seller's Knowledge, each Healthcare Provider have been and are in compliance with all Laws and Orders."

305. The Purchase Agreement defined "Laws and Orders" expansively to include "any federal, state, or local statute, law, ordinance, rule or regulation, including common law within the United States." (Ex. 1, § 6.9(o).)

306.    *Second*, in Section 3.2(b), Dr. Vergilis and SCAS jointly and severally represented and warranted that "[i]n the six years prior to the Closing Date, Seller and each of Seller's directors, officers, shareholders, members, managers, and employees have been and are in compliance with all Healthcare Laws."

307.    The Purchase Agreement defined "Healthcare Laws" to include "any and all local, state, federal, national, supranational and foreign healthcare laws, rules, regulations, orders, guidelines, requirements, manual provisions, policies and administrative guidance relating to the regulation of the Seller and the Business, including without limitation, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), . . . the federal Anti-kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), . . . the civil False Claims Act (31 U.S.C. §§ 3729 et seq.), . . . the Civil Monetary Penalties Law including the Anti-Inducement Law (42 U.S.C. § 1320a-7a), . . . the Federal Health Care Fraud Law (18 U.S.C. § 1347), the criminal false claims statutes (18 U.S.C. §§ 286, 287 and 1001), . . . and any counterpart or comparable State laws, each as amended from time to time and the rules and regulations promulgated pursuant to all such applicable laws."

308.    *Third*, in Section 3.4(b), Dr. Vergilis and SCAS jointly and severally represented and warranted that SCAS "maintains auditing and monitoring process and systems of internal controls as part of its healthcare compliance program that are sufficient to provide reasonable assurances of compliance by the Seller with all Healthcare Laws."

309.    *Fourth*, in Section 3.4(g) of the Purchase Agreement, Dr. Vergilis and SCAS jointly and severally represented and warranted that "[i]n the six years prior to the Closing Date, Seller has properly coded all medical records and properly billed for all services and products."

310.     During the negotiations of the Purchase Agreement, Dr. Vergilis and SCAS provided Plaintiffs with SCAS's income statements for the prior three fiscal years (*i.e.*, 2019, 2020, and 2021) and for the partial year ending August 31, 2022.

311.     In Section 3.5 of the Purchase Agreement, Dr. Vergilis and SCAS represented and warranted that those income statements had been "prepared in accordance with the cash basis method of accounting consistently applied and maintained throughout the periods indicated and all of which fairly present the financial condition of Seller as of their respective dates and the results of its operations for the periods covered by those income statements."

312.     The Purchase Agreement provided that the foregoing representations and warranties all of which are from Section 3.4 "shall survive the Closing Date for six years after the Closing Date."  (Ex. 1 § 5.5.)

313.     In the Purchase Agreement, SCAS and Dr. Vergilis also agreed to indemnify Forefront Management and Forefront East from losses and liabilities caused by the fact that any or all of the foregoing representations and warranties were false.

314.     Section 5.1 of the Purchase Agreement provides, in relevant part:

> From and after the Closing Date, and regardless of any investigation made at any time by or on behalf of Buyer or any information Buyer may have, Seller and Owner, jointly and severally, covenant and agree to indemnify, defend and hold Buyer, FD, their respective Affiliates, and their respective directors, officers, shareholders, employees, agents, members and managers (collectively, the "***Buyer Indemnitees***") harmless from and against any demand, claim, damage, liability, loss, cost or expense (including interest, penalties, costs of preparation and investigation and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors), whether or not involving a third party claim (collectively, "***Buyer's Damages***"), directly or indirectly arising out of, resulting from or relating to any of the following: (a) any inaccuracy in or breach of any representation or warranty of Seller or Owner in this Agreement or any Transaction Document; (b) any failure of Seller or Owner to duly perform or observe any obligation,

covenant or agreement to be performed or observed by Seller or Owner pursuant to this Agreement or any of the Transaction Documents after Closing; (c) any acts or omissions of Seller or Owner prior to Closing, or any events occurring or conditions existing with respect to Seller, Owner, or the Purchased Assets prior to Closing; . . . [and] (e) Seller's or Owner's fraud, intentional misconduct, or intentional misrepresentation . . . .

## Dr. Vergilis's Employment Agreement And Its Key Terms

315.     Contemporaneously with the execution of the Purchase Agreement, Dr. Vergilis and Forefront East entered into an Employment Agreement effective as of November 18, 2022.  A true and correct copy of the Employment Agreement is attached as Exhibit 2.

316.     In the Employment Agreement, Forefront East agreed to employ Dr. Vergilis as a medical physician for an initial five-year term.  (Ex. 2, § 1.1.)

317.     Section 1.2 of the Employment Agreement sets forth Dr. Vergilis's duties.

318.     Dr. Vergilis agreed in Sections 4.3.1, 4.3.2, and 4.3.3 of the Employment Agreement that, during her employment, she would: (a) materially observe and conform to all laws and American Medical Association principles of medical ethics; (b) materially comply with all Forefront employment policies or procedures applicable to physician-employees that are in effect from time to time; and (c) materially comply with all reasonable directions and orders of either Forefront's management or Forefront's Physician Board.

319.     In the Employment Agreement, Forefront East agreed to compensate Dr. Vergilis with a combination of an annual draw, a bonus, and benefits.

320.     In Section 3.1 and Exhibit A of the Employment Agreement, Forefront East agreed to pay Dr. Vergilis a $500,000 annual draw against her "Profit Share Bonus."

321.     Pursuant to Section 3.2 and Exhibit C of the Employment Agreement, Forefront East agreed to pay Dr. Vergilis a "Profit Share Bonus."

322.    Pursuant to Exhibit C, the Profit Share Bonus was to be calculated as follows: "(a) 100.0% of annual Practice EBITDA in excess of $3.0 million but less than $4.5 million; plus (ii) 50.0% of annual Practice EBITDA in excess of $4.5 million; minus (b) Draw expenses and Quarterly Minimum Payments received during the respective period."

323.    Thus, under the Employment Agreement, Dr. Vergilis's compensation was tied to the future EBITDA of the practice and its revenues and profitability.

**The Fraudulent Scheme Caused Plaintiffs To Enter Into The Purchase Agreement And The Employment Agreement And To Pay Defendants**

324.    Based on the false and fraudulent financial figures and income statements that Defendants provided, Plaintiffs agreed to purchase SCAS, Forefront Management agreed to pay Defendants $19,670,000 in cash, Forefront Holdings agreed to provide SCAS with 50,000 of its Class B Common Units, Forefront East agreed to employ and pay Dr. Vergilis pursuant to the Employment Agreement, and Forefront Management agreed to employ and pay Kalner.

325.    Had Plaintiffs known that Defendants were engaged in a false coding and billing scheme, they would not have agreed to (or done) any of those things.

326.    Further, had Plaintiffs known that Defendants marketed SCAS by including fraudulent obtained profits and revenues in its income statements and the financial figures derived from those statements, they would not have entered into the Purchase Agreement or the Employment Agreement.

**After Closing, Plaintiffs Discover The Fraudulent Scheme**

327.    After entering into the Purchase Agreement and Employment Agreement in November 2022, Plaintiffs discovered the fraudulent scheme.

328.    On March 1, 2023, once Plaintiffs had access to SCAS's full claims data and universe of coding procedures, Forefront initiated an audit of the billing and coding procedures at

34

the clinics acquired from SCAS. The audit was part of Plaintiffs' internal robust compliance program and Forefront Management's implementation of its own billing and coding system at the SCAS clinics. In the audit, Plaintiffs reviewed and audited a series of claims from Defendants' clinics.

329. This prospective compliance auditing revealed that the clinics had a practice of deceptive and fraudulent coding practices, as alleged in more detail above. Prior to the acquisition, Plaintiffs did not, and would not have been able to, identify these practices.

330. The audit uncovered each of the methods of fraud described above.

331. Plaintiffs then promptly took steps to stop the fraud and ensure no false or fraudulent bills were submitted to third-party payers.

**Plaintiffs Pay Various Third Parties For Remediation And Investigation**

332. As a result of the discovered fraud, Forefront Management and Forefront East incurred expenses and made numerous and substantial payments to third parties.

333. Forefront Management engaged its billing and coding team, along with additional contracted coding reviewers, to review claims billed to Medicare by Defendants and investigate whether the claims were proper.

334. Forefront Management paid the contracted coding reviewers $72,024.48 for their work on the review.

335. Forefront Management also incurred approximately $30,000 in overtime and travel expenses related to the investigation.

336. Forefront Management's coding and billing team reviewed a statistically valid random sample of a set of 2,031 claims billed to Medicare generated using statistical software from the Office of Inspector General.

337.     The review identified a 24.16% financial error rate calculated based on the difference between what was actually paid and what should have been paid following review.

338.     Based on the review, on January 25, 2024, Forefront East returned $245,751.00 to Medicare's Administrative Contractor.

339.     Forefront Management also engaged the law firm Foley & Lardner, LLP ("Foley") to advise on remediation and diligently investigate the issue.

340.     Forefront Management paid Foley approximately $51,000 for its work on the remediation and investigation.

**Plaintiffs Terminate Defendants And Other Employees, And The SCAS Clinics Fail**

341.     After Plaintiffs discovered the fraud, Forefront Management terminated Kalner's employment with cause and Forefront East terminated Dr. Vergilis's employment with cause on, respectively, August 4 and 15, 2023.

342.     Plaintiffs also took steps to ensure that none of the remaining clinicians at the former SCAS clinics engaged in the same fraudulent coding and billing practices that Dr. Vergilis and Kalner had instructed them to utilize.

343.     These steps were effective, such that the former SCAS clinics engaged in proper and legally compliant coding and billing practices.

344.     Plaintiffs took reasonable steps to find a replacement physician for Dr. Vergilis to run the former SCAS clinics.

345.     To assist Plaintiffs' efforts in finding a replacement physician, Forefront Management paid $46,128.94 to an internal recruiter.

346.     Plaintiffs were not able to find a replacement physician because, among other things, the patient population and staff members at the SCAS clinics primarily spoke Russian and

not English, and finding a qualified Russian-speaking dermatologist willing to work at the four different clinics was not feasible.

347.     Further, with no replacement physician and no fraudulently obtained revenues, the SCAS clinics were no longer viable and sustainable clinics because the expenses of running them exceeded the revenues they were generating.

348.     As a result, Forefront East had to shutter the clinics, terminate their staff, and terminate the associated leases.

349.     Forefront Management also had to terminate employees who worked for the former SCAS practices.

350.     Forefront East and Forefront Management each had to make severance payments to the employees whose jobs were terminated.

351.     Forefront East and Forefront Management paid a total of $155,443.76 in employee severance payments.

352.     Forefront Management also paid $43,167.50 to another outside law firm to investigate complaints about the practice, and prepare the necessary paperwork for the severance payments.   The investigation revealed that Dr. Vergilis and Kalner were violating Forefront policies in numerous ways, including by not providing staff members with breaks if they worked for longer than six hours.

353.     Further, to terminate four leases early, Forefront East had to pay its landlords and brokers $278,777.09 via a combination of cash payments and the release of security deposits.

354.     Forefront East paid outside counsel $4,200 to represent it in the lease termination negotiations.

**Dr. Vergilis And SCAS Breached The Purchase Agreement**

355.     The existence of the fraudulent scheme both before and after the parties entered into the Purchase Agreement constitutes a breach of the Agreement's representations and warranties.

356.     *First*, Dr. Vergilis and SCAS breached the representation and warranty in Section 3.1(a) that:  "in the six years prior to the Closing Date, Seller and Owner [*i.e.*, SCAS and Dr. Vergilis] and, to Seller's Knowledge, each Healthcare Provider have been and are in compliance with all Laws and Orders."  Indeed, their fraudulent billing scheme violated multiple laws, including Title XVIII of the Social Security Act (Medicare), Title XIX of the Social Security Act (Medicaid), the Anti-kickback Statute, the Stark Law, the False Claims Act, the Civil Monetary Penalties Law, the Federal Health Care Fraud Law, and the criminal false claims statutes.

357.     *Second*, Dr. Vergilis and SCAS breached the representation and warranty in Section 3.2(b) that:  "[i]n the six years prior to the Closing Date, Seller and each of Seller's directors, officers, shareholders, members, managers, and employees have been and are in compliance with all Healthcare Laws."  Indeed, their fraudulent billing scheme violated multiple Healthcare Laws, including Title XVIII of the Social Security Act (Medicare), Title XIX of the Social Security Act (Medicaid), the Anti-kickback Statute, the Stark Law, the False Claims Act, the Civil Monetary Penalties Law, the Federal Health Care Fraud Law, and the criminal false claims statutes.

358.     *Third*, Dr. Vergilis and SCAS breached the representation and warranty in Section 3.4(b) that SCAS: "maintains auditing and monitoring process and systems of internal controls as part of its healthcare compliance program that are sufficient to provide reasonable assurances of compliance by the Seller with all Healthcare Laws."  Indeed, SCAS did not have any processes or

systems of internal controls that were sufficient to provide reasonable assurances of compliance by SCAS with all Healthcare Laws.

359.    *Fourth*, Dr. Vergilis and SCAS breached the representation and warranty in Section 3.4(g) that: "[i]n the six years prior to the Closing Date, Seller has properly coded all medical records and properly billed for all services and products."  Indeed, in the prior six years, they had failed to properly code all medical records and properly bill for all services and products. Their fraud was so rampant that the financial error rate for SCAS's claims (based on the difference between what was actually paid and what should have been paid following review) was over 24%.

360.    *Fifth*, Dr. Vergilis and SCAS breached the representation and warranty in Section 3.5 that the income statements they provided to Plaintiffs had been: "prepared in accordance with the cash basis method of accounting consistently applied and maintained throughout the periods indicated and all of which fairly present the financial condition of Seller as of their respective dates and the results of its operations for the periods covered by those income statements."  Indeed, those income statements included fraudulently obtained revenues and profits, meaning that the statements did not fairly present SCAS's financial condition.

361.    Dr. Vergilis and SCAS made the representations and warranties described above at the time of the closing and for six years after the closing.  That means that their conduct both before and after closing violated the Purchase Agreement.

362.    As alleged below, Dr. Vergilis and SCAS also breached their obligation to indemnify Plaintiffs.

**Dr. Vergilis Breached The Employment Agreement And Her Fiduciary Duties**

363.    Dr. Vergilis also breached her Employment Agreement and the fiduciary duties she owed to Forefront East.

364.     Dr. Vergilis's fraudulent billing and coding scheme after November 18, 2023 violated the promises in Sections 4.3.1, 4.3.2, and 4.3.3 of the Employment Agreement that, during her employment, she would: (a) materially observe and conform to all laws and American Medical Association principles of medical ethics; (b) materially comply with all Forefront employment policies or procedures applicable to physician-employees that are in effect from time to time; and (c) materially comply with all reasonable directions and orders of either Forefront's management or Forefront's Physician Board.

365.     As to subparagraphs (b) and (c) in the prior Paragraph, Forefront has policies, procedures, and directives in place that required Dr. Vergilis to refrain from fraudulent coding and billing.

366.     Dr. Vergilis also owed fiduciary duties to Forefront East, her employer, including the duties of loyalty, care, and good faith.

367.     Dr. Vergilis's fraudulent coding and billing scheme violated those duties.

368.     The scheme after November 18, 2023 also constituted a method by which Dr. Vergilis embezzled, or attempted to embezzle, funds from Forefront East.

369.     For example, Forefront East paid Dr. Vergilis based on revenues that it later returned to Medicare. Thus, Dr. Vergilis's scheme caused Forefront East to overpay her.

**Kalner Breached His Fiduciary Duties**

370.     Kalner owed fiduciary duties to Forefront Management, his employer, including the duties of loyalty, care, and good faith.

371.     Kalner's fraudulent coding and billing scheme violated those duties.

372.     The scheme after November 18, 2023 also constituted a method by which Kalner embezzled, or attempted to embezzle, funds from Forefront East by increasing the payments it made to Dr. Vergilis, his wife.

**Plaintiffs' Damages**

373.     Plaintiffs have sustained multiple forms of damages because of Defendants' RICO violations, breaches of contract, and breaches of fiduciary duty.

374.     *First*, Forefront Management paid $19,670,000 in cash to acquire SCAS although it was worth essentially nothing.

375.     *Second*, Forefront Management paid outside counsel $21,607.50 to represent it in conjunction with the Purchase Agreement.

376.     *Third*, Forefront Management incurred approximately $30,000 for internal overtime and travel costs to investigate and remediate the fraud.

377.     *Fourth*, Forefront Management paid $72,024.48 for contracted coding reviewers to investigate the fraud.

378.     *Fifth*, Forefront Management paid approximately $51,000 to Foley to investigate the fraud.

379.     *Sixth*, Forefront East paid $245,751.00 to Medicare's Administrative Contractor as a result of the billing and coding scheme.

380.     *Seventh*, Forefront Management paid $43,167.50 to a law firm to assist with the severance payments and investigate other complaints.

381.     *Eighth*, Forefront Management paid $46,128.94 to an internal recruiter to attempt to locate a replacement physician for Dr. Vergilis.

382.    *Ninth*, Forefront East and Forefront Management paid a total of $155,443.76 in employee severance payments.

383.    *Tenth*, Forefront East paid its landlords and brokers $278,777.09 via a combination of cash payments and the release of security deposits to terminate leases for the SCAS clinics.

384.    *Eleventh*, Forefront East paid its outside counsel $4,200 to represent it in the lease termination negotiations.

385.    *Twelfth*, Forefront East paid Dr. Vergilis $369,320.78 in compensation during the time in which she was breaching her fiduciary duties and Employment Agreement.

386.    *Thirteenth*, Forefront Management paid Kalner $141,538.50 in compensation during the time in which he was breaching his fiduciary duties.

387.    *Fourteenth*, Plaintiffs lost the benefit of their bargain under the Purchase Agreement, including the future profits they expected to obtain from the SCAS clinics.

**The Indemnification Demand**

388.    Pursuant to Section 5.1 of the Purchase Agreement, Dr. Vergilis and SCAS are required to indemnify Plaintiffs for their losses and liabilities resulting from the breaches of the Agreement.

389.    On October 21, 2024, Plaintiffs sent a letter demanding that Dr. Vergilis and SCAS indemnify them for losses and liabilities in the amount of $21,128,959.55 (the "Indemnification Demand Letter").

390.    Dr. Vergilis and SCAS failed and refused to indemnify Plaintiffs despite their contractual obligation to do so.

**Forefront Holdings Cancelled SCAS's Membership Interests**

391.    After Plaintiffs discovered Defendants' fraudulent scheme and their breaches of the Asset Purchase Agreement, Forefront Holdings cancelled the 50,000 Class B Common Units that it had issued to SCAS as consideration under the Purchase Agreement.

392.    As a result, SCAS is no longer a member of Forefront Holdings, and its books and records do not list SCAS (or Dr. Vergilis) as a member.

393.    In the Indemnification Demand Letter, Forefront Holdings notified SCAS that it had cancelled those shares and asked SCAS and Dr. Vergilis to confirm their agreement to that cancellation.

394.    SCAS and Dr. Vergilis failed to provide that agreement and, on information and belief, dispute the cancellation.

## Count I—Violation of 18 U.S.C. § 1962(c) (RICO)

### Forefront Management and Forefront East v. Dr. Vergilis and Kalner

395.    Forefront Management and Forefront East reallege and incorporate each of the foregoing paragraphs above as if fully set forth herein.

396.    SCAS is an enterprise within the meaning of 18 U.S.C. §§ 1962(c) and 1961(4), and it was engaged in activities that affected interstate commerce.

397.    Dr. Vergilis and Kalner are each a "person" within the meaning of 18 U.S.C. §§ 1962(c) and 1961(3).

398.    Dr. Vergilis and Kalner agreed to and did conduct and participate in the conduct of SCAS's affairs through a pattern of racketeering activity—as that phrase is used in 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(5)—for the unlawful purpose of intentionally defrauding Plaintiffs into purchasing SCAS. Specifically, they conducted and participated in the conduct of SCAS's

affairs entering fraudulent codes into its EHR system, submitting fraudulent bills to third-party payers, and directing SCAS's clinicians to engage in fraudulent charting and coding practices.

399.    Pursuant to and in furtherance of their scheme, Dr. Vergilis and Kalner committed thousands of related acts of wire fraud under 18 U.S.C. § 1343 from at least 2019 through November 2022.

400.    These repeated acts of billing fraud constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

401.    Dr. Vergilis and Kalner directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

402.    As a direct and proximate result of Dr. Vergilis and Kalner's racketeering activities and violations of 18 U.S.C. § 1962(c), Forefront Management and Forefront East have been injured in their business and property in that, among other things:  (a) Forefront Management paid $19,670,000 in cash to acquire SCAS; (b) Forefront East paid Dr. Vergilis $369,320.78 and Forefront Management paid Kalner $141,538.50 in compensation after the acquisition that was unearned and inflated by fraud; (c) Forefront Management and Forefront East paid $245,751.00 to Medicare's Administrative Contractor as a result of the billing and coding scheme; and (d) Forefront Management and Forefront East paid $720,349.27 in increased costs and to third parties, including to investigate and remediate the scheme and wind down SCAS's business.

403.    Dr. Vergilis and Kalner's conduct in devising and executing the coding and billing scheme was intentional, wanton, and malicious.

Wherefore, for the foregoing reasons, Forefront Management and Forefront East request that this Court enter judgment in their favor and against Dr. Vergilis and Kalner, as follows:

A.     Awarding Forefront Management and Forefront East their compensatory damages of at least $21,128,959.55;

B.     Awarding Forefront Management and Forefront East treble damages of at least $63,386,878.65 pursuant to 18 U.S.C. § 1962(c);

C.     Awarding Forefront Management and Forefront East punitive damages;

D.     Awarding Forefront Management and Forefront East pre-judgment and post-judgment interest on any money damages awarded, at the maximum rates authorized by law;

E.     Awarding Forefront Management and Forefront East their attorney's fees, costs, and expenses pursuant to 18 U.S.C. § 1962(c); and

F.     Awarding Forefront Management and Forefront East all other and further relief that is necessary and appropriate under the circumstances.

## Count II—Violation of 18 U.S.C. § 1962(d) (RICO Conspiracy)

### Forefront Management and Forefront East v. Dr. Vergilis and Kalner

404.     Forefront Management and Forefront East reallege and incorporate each of the foregoing paragraphs above as if fully set forth herein.

405.     Dr. Vergilis and Kalner willfully combined, conspired, and agreed with one another to violate Title 18 U.S.C. §1962(c), that is, to conduct and/or participate, directly or indirectly, in the continuous pattern of racketeering activity described above.

406.     The object of the conspiracy was to defraud Forefront Management and Forefront East by violating the RICO statute, as described in Count I above, by participating in a pattern of racketeering activity to perpetuate a billing fraud scheme that inflated SCAS's apparent profits and then induced Plaintiffs to purchase SCAS at an inflated price and continue paying Dr. Vergilis and Kalner based on fraudulently obtained revenues.

407. As a direct and proximate result of Dr. Vergilis and Kalner's violations of 18 U.S.C. § 1962(d), Forefront Management and Forefront East have been injured in their business and property in that, among other things: (a) Forefront Management paid $19,670,000 in cash to acquire SCAS; (b) Forefront East paid Dr. Vergilis $369,320.78 and Forefront Management paid Kalner $141,538.50 in compensation after the acquisition that was unearned and inflated by fraud; (c) Forefront East paid $245,751.00 to Medicare's Administrative Contractor as a result of the billing and coding scheme; and (d) Forefront Management and Forefront East paid $720,349.27 in increased costs and to third parties, including to investigate and remediate the scheme and wind down SCAS's business.

408. Dr. Vergilis and Kalner's conduct in devising and executing the coding and billing scheme and related conspiracy was intentional, wanton, and malicious.

Wherefore, for the foregoing reasons, Forefront Management and Forefront East request that this Court enter judgment in their favor and against Dr. Vergilis and Kalner, as follows:

A. Awarding Forefront Management and Forefront East their compensatory damages of at least $21,128,959.55;

B. Awarding Forefront Management and Forefront East treble damages of at least $63,386,878.65 pursuant to 18 U.S.C. § 1962(c);

C. Awarding Forefront Management and Forefront East punitive damages;

D. Awarding Forefront Management and Forefront East pre-judgment and post-judgment interest on any money damages awarded, at the maximum rates authorized by law;

E. Awarding Forefront Management and Forefront East their attorney's fees, costs, and expenses pursuant to 18 U.S.C. § 1962(c); and

F. Awarding Forefront Management and Forefront East all other and further relief that is necessary and appropriate under the circumstances.

## Count III—Breach Of Contract (Asset Purchase Agreement)

### Plaintiffs v. SCAS and Dr. Vergilis

409.    Plaintiffs reallege and incorporate each of the foregoing paragraphs above as if fully set forth herein.

410.    The Purchase Agreement is a valid, binding, and enforceable contract.

411.    Plaintiffs have performed, or have been excused from performing, all of their obligations under the Purchase Agreement, and all conditions precedent to their rights under the Purchase Agreement have occurred or have otherwise been excused.

412.    In the Purchase Agreement, SCAS and Dr. Vergilis represented and warranted (using the defined terms in the Purchase Agreement) that:

    a.      In the six years prior to the Closing Date, Seller and Owner (*i.e.*, SCAS and Dr. Vergilis) and, to Seller's Knowledge, each Healthcare Provider have been and are in compliance with all Laws and Orders;

    b.      In the six years prior to the Closing Date, Seller and each of Seller's directors, officers, shareholders, members, managers, and employees have been and are in compliance with all Healthcare Laws;

    c.      SCAS maintains auditing and monitoring process and systems of internal controls as part of its healthcare compliance program that are sufficient to provide reasonable assurances of compliance by the Seller with all Healthcare Laws;

    d.      In the six years prior to the Closing Date, Seller has properly coded all medical records and properly billed for all services and products; and

    e.      The income statements for the prior three fiscal years (*i.e.*, 2019, 2020, and 2021) and for the partial year ending August 31, 2022 that Dr. Vergilis and SCAS tendered to Plaintiffs had been prepared in accordance with the cash basis method of accounting consistently applied and maintained throughout the periods indicated and fairly presented the financial condition of Seller as of their respective dates and the results of its operations for the periods covered by those income statements.

413. In the Purchase Agreement, SCAS and Dr. Vergilis also agreed to indemnify Plaintiffs from liabilities that they may have to third parties if any or all of the foregoing representations and warranties were false.

414. SCAS and Dr. Vergilis breached the Purchase Agreement in multiple ways, including: (a) because the just-listed representations and warranties were all false; and (b) by failing and refusing to indemnify Plaintiffs for the liabilities they paid to third parties despite Plaintiffs' demand for indemnification.

415. As a direct and proximate result of SCAS and Dr. Vergilis's multiple breaches of the Purchase Agreement, Plaintiffs have suffered, and will continue to suffer, damages.

Wherefore, for the foregoing reasons, Plaintiffs request that this Court enter judgment in their favor and against Dr. Vergilis and SCAS, as follows:

A. Awarding Plaintiffs their compensatory damages of at least $21,128,959.55;

B. Awarding Plaintiffs pre-judgment and post-judgment interest on any money damages awarded, at the maximum rates authorized by law;

C. Awarding Plaintiffs their attorney's fees pursuant to Section 5 of the Purchase Agreement and their costs and expenses;

D. In the alternative, rescinding the Purchase Agreement;

E. Confirming the cancellation of the Class B Common Units Forefront Holdings issued to SCAS; and

F. Awarding Plaintiffs all other and further relief that is necessary and appropriate under the circumstances.

## Count IV—Breach Of Contract (Employment Agreement)

### Forefront East v. Dr. Vergilis

416. Forefront East realleges and incorporates each of the foregoing paragraphs above as if fully set forth herein.

417.   The Employment Agreement is a valid, binding, and enforceable contract.

418.   Forefront East has performed, or has been excused from performing, all of its obligations under the Employment Agreement, and all conditions precedent to its rights under the Employment Agreement have occurred or have otherwise been excused.

419.   In the Employment Agreement, Dr. Vergilis agreed that, during her employment, she would: (a) materially observe and conform to all laws and American Medical Association principles of medical ethics; (b) materially comply with all Forefront employment policies or procedures applicable to physician-employees that are in effect from time to time; and (c) materially comply with all reasonable directions and orders of either Forefront's management or Forefront's Physician Board.

420.   Dr. Vergilis breached the Employment Agreement in multiple ways, including by continuing to engage in coding and billing fraud after she entered into the Employment Agreement, in violation of multiple laws, Forefront employment policies applicable to physician-employees, and reasonable directions and orders of Forefront.

421.   As a direct and proximate result of Dr. Vergilis's breach of the Employment Agreement, Forefront East has suffered, and will continue to suffer damages.

Wherefore, for the foregoing reasons, Forefront East requests that this Court enter judgment in its favor and against Dr. Vergilis, as follows:

    A.    Awarding Forefront East its consequential damages of at least $1,295,813.55;

    B.    Awarding Forefront East pre-judgment and post-judgment interest on any money damages awarded, at the maximum rates authorized by law;

    C.    Awarding Forefront East its attorney's fees, costs, and expenses;

D.    In the alternative, rescinding the Employment Agreement; and

E.    Awarding Forefront East all other and further relief that is necessary and appropriate under the circumstances.

## Count V—Breach of Fiduciary Duty

### Forefront East v. Dr. Vergilis

422.    Forefront East realleges and incorporates each of the foregoing paragraphs above as if fully set forth herein.

423.    As an employee of Forefront East, Dr. Vergilis owed it fiduciary duties, including the duties of loyalty, care, and good faith and fair dealing.

424.    Dr. Vergilis breached those fiduciary duties by engaging in the fraudulent billing scheme as a way to increase SCAS's putative profits and her own compensation. The scheme was, thus, a way that Dr. Vergilis embezzled or attempted to embezzle funds from Forefront East.

425.    As a direct and proximate result of Dr. Vergilis's breach of fiduciary duties, Forefront East has suffered, and will continue to suffer damages, including for example: (a) $245,751.00 it paid to Medicare's Administrative Contractor; and (b) $369,320.78 that it paid Dr. Vergilis during the time period in which she breached her fiduciary duties.

426.    Pursuant to the faithless-servant doctrine, Dr. Vergilis must return to Forefront East the $369,320.78 in compensation paid to her during the period in which she was breaching her fiduciary duties.

Wherefore, for the foregoing reasons, Forefront East requests that this Court enter judgment in its favor and against Dr. Vergilis, as follows:

A.    Awarding Forefront East its consequential damages of at least $245,751;

B. Requiring Dr. Vergilis to return $369,320.78 to Forefront East;

C. Awarding Forefront East punitive damages;

D. Awarding Forefront East pre-judgment and post-judgment interest on any money damages awarded, at the maximum rates authorized by law;

E. Awarding Forefront East its attorney's fees, costs, and expenses; and

F. Awarding Forefront East all other and further relief that is necessary and appropriate under the circumstances.

### Count VI—Breach of Fiduciary Duty

**Forefront Management v. Kalner**

427. Forefront Management realleges and incorporates each of the foregoing paragraphs above as if fully set forth herein.

428. As an employee of Forefront Management, Kalner owed it fiduciary duties, including the duties of loyalty, care, and good faith and fair dealing.

429. Kalner breached those fiduciary duties by engaging in the fraudulent billing scheme as a way to increase SCAS's putative profits and Dr. Vergilis's compensation. The scheme was, thus, a way that Kalner embezzled or attempted to embezzle funds.

430. As a direct and proximate result of Kalner's breach of fiduciary duties, Forefront Management has suffered, and will continue to suffer damages, including for example the $141,538.50 that it paid Kalner during the time period in which he breached his fiduciary duties.

431. Pursuant to the faithless-servant doctrine, Kalner must return to Forefront Management the $141,538.50 in compensation it paid to him during the period in which he was breaching his fiduciary duties.

Wherefore, for the foregoing reasons, Forefront Management requests that this Court enter judgment in its favor and against Kalner, as follows:

A. Awarding Forefront Management its consequential damages;

B. Requiring Kalner to return $141,538.50 to Forefront Management;

C. Awarding Forefront Management punitive damages;

D. Awarding Forefront Management pre-judgment and post-judgment interest on any money damages awarded, at the maximum rates authorized by law;

E. Awarding Forefront Management its attorney's fees, costs, and expenses; and

F. Awarding Forefront Management all other and further relief that is necessary and appropriate under the circumstances.

## Count VII—Civil Conspiracy

### Plaintiffs v. Dr. Vergilis and Kalner

432.  Plaintiffs reallege and incorporate each of the foregoing paragraphs above as if fully set forth herein.

433.  Dr. Vergilis and Kalner willfully combined, conspired, and agreed with one another to have SCAS fraudulently obtain payments from third-party payers, use the payments to drive up SCAS's putative profits, and sell SCAS for a purchase price determined by those fraudulently obtained profits.

434.  Dr. Vergilis and Kalner each committed thousands of overt acts in furtherance of the conspiracy, including by Dr. Vergilis entering fraudulent codes, Dr. Vergilis instructing SCAS's employees to enter fraudulent codes, Kalner changing codes, and Kalner submitting false bills to third parties.

435. Dr. Vergilis and Kalner each intentionally participated in the furtherance of the scheme.

436. As a direct and proximate result of the conspiracy, Plaintiffs have suffered, and will continue to suffer damages.

Wherefore, for the foregoing reasons, Plaintiffs request that this Court enter judgment in their favor and against Dr. Vergilis and Kalner, as follows:

A. Awarding Plaintiffs their consequential damages of at least $21,128,959.55;

B. Awarding Plaintiffs punitive damages;

C. Awarding Plaintiffs pre-judgment and post-judgment interest on any money damages awarded, at the maximum rates authorized by law;

D. Awarding Plaintiffs their costs and expenses; and

E. Awarding Plaintiffs all other and further relief that is necessary and appropriate under the circumstances.

## Count VIII – Declaratory Judgment

### Forefront Holdings v. Dr. Vergilis and SCAS

437. Forefront Holdings realleges and incorporates each of the foregoing paragraphs above as if fully set forth herein.

438. Forefront Holdings, Dr. Vergilis, and SCAS are embroiled in a substantial controversy, and they have adverse legal interests.

439. Forefront Holdings' position is that the cancellation of SCAS's Class B Common Units was proper and valid and that SCAS is no longer a member of Forefront Holdings.

440. Dr. Vergilis and SCAS's position, on information and belief, is that the cancellation of SCAS's Class B Common Units was not proper and valid and that SCAS remains a member of Forefront Holdings.

441. The declarations sought herein would clarify and settle legal relations that are in issue as set forth above and herein.

442. The declarations sought herein would terminate and afford greater relief from the uncertainty, insecurity, and controversy giving rise to present action.

Wherefore, for the foregoing reasons, Forefront Holdings requests that the Court enter judgment in its favor and against Dr. Vergilis and Kalner, as follows:

A.  Declaring that Forefront Holdings' cancellation of SCAS's Class B Common Units was proper and valid and that SCAS is no longer a member of Forefront Holdings; and

B.  Awarding Forefront Holdings all other and further relief that is necessary and appropriate under the circumstances.

## Jury Demand

Plaintiffs demand a trial by jury on all issues triable of right by jury under applicable law.

Date: October 28, 2024

> FOREFRONT MANAGEMENT, LLC,
> FOREFRONT DERMATOLOGY - EAST
> PROFESSIONAL, LLC, and
> FOREFRONT PHYSICIANS HOLDINGS,
> LLC
>
> /s/     *Courtney D. Tedrowe*
>         One of Their Attorneys
> Courtney D. Tedrowe (NY # 3997418)
> Kerryann M. Haase (pending pro hac vice)
> Andrew P. Shelby (pending pro hac vice)
> Michael Best & Friedrich LLP
> 444 West Lake Street, Suite 3200
> Chicago, Illinois 60606
> 312.222.0800
> khminton@michaelbest.com
> cdtedrowe@michaelbest.com
> andrew.shelby@michaelbest.com
>
> Ena M. Allen (pending pro hac vice)
> 790 North Water Street, Suite 2500
> Milwaukee, Wisconsin 53202
> ena.allen@michaelbest.com