UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FOREFRONT MANAGEMENT, LLC et al.,

                        Plaintiffs,

                                                        24-cv-8189 (LAK)

                -against-

IRENE J. VERGILIS-KALNER, et al.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
┌──────────────────────────────┐
│ USDS SDNY                     │
│ DOCUMENT                      │
│ ELECTRONICALLY FILED          │
│ DOC #: _____          │
│ DATE FILED:  04/24/2025       │
└──────────────────────────────┘
```

## MEMORANDUM OPINION

                Appearances:

                                Andrew P. Shelby
                                Ena M. Allen
                                Kerryann M. Haase
                                Courtney D. Tedrowe
                                MICHAEL BEST & FRIEDRICH LLP

                                *Attorneys for Plaintiffs*

                                Jacob Laufer
                                JACOB LAUFER, P.C.

                                Richard S. Harrow
                                O'CONNELL & ARONOWITZ, PC

                                *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

                This is an action arising from plaintiffs' purchase of medical clinics and related

assets.  Plaintiffs allege that, after the purchase, they discovered that defendants had inflated the

value of those assets through fraudulent billing practices.  Plaintiffs brought this lawsuit alleging

violations of the federal Racketeer Influenced and Corrupt Organizations ("RICO") laws and

breaches of contract and fiduciary duties.  Defendants move to dismiss the RICO and fiduciary duty-related claims.

## *Background*[1]

Defendant Irene Vergilis-Kalner ("Vergilis") is a dermatologist who started and ran Skin Cancer & Aesthetic Surgery, P.C. ("SCAS"), a dermatology practice.  Plaintiffs Forefront Management, LLC ("Forefront Management"), Forefront Dermatology – East Professional, LLC ("Forefront East"), and Forefront Physicians Holdings, LLC ("Forefront Holdings") allege that Vergilis and her husband, defendant Alec Kalner ("Kalner"), ran SCAS as an enterprise to defraud patients, Medicare, and insurance companies through overbilling schemes.  For example, plaintiffs allege that Vergilis and Kalner (1) falsely sought reimbursement for multiple procedures when Vergilis had conducted only one,[2] (2) sought reimbursement for duplicative procedures that were not performed or were unnecessary,[3] (3) churned patient visits by cycling between alternate diagnoses,[4] (4) churned patients via unnecessary follow-up visits and procedures,[5] and (5) "upcoded" certain

---

[1]    For the purpose of this motion, the Court assumes the truth of plaintiffs' allegations and draws all inferences favorable to plaintiffs to which the allegations reasonably are susceptible.

[2]    Dkt 30 ("Am. Compl.") ¶¶ 97–103.

[3]    *Id.* ¶¶ 104–08.

[4]    *Id.* ¶¶ 109–20.

[5]    *Id.* ¶¶ 121–29.

claims in order to obtain larger reimbursements from insurers,[6] among other methods to inflate SCAS's revenues.

In November 2022, plaintiffs, certain of their affiliates, Vergilis, and SCAS entered into an asset purchase agreement pursuant to which Plaintiffs acquired SCAS's assets in exchange for approximately $25 million.[7]  Plaintiffs allege that the purchase price was calculated using a multiplier of SCAS's income — in other words, that they agreed to pay approximately eight times SCAS's $3.3 million in adjusted net income for the twelve-month period from June 2021 to June 2022.[8]  After completing the purchase, plaintiffs initiated an audit of the billing and coding procedures at the clinics they had acquired, which uncovered the allegedly fraudulent practices set forth above.[9]  Plaintiffs allege that, after eliminating the fraudulently obtained revenues, SCAS's assets "were worth essentially nothing."[10]

On October 28, 2024, plaintiffs filed this lawsuit against Vergilis, Kalner, and SCAS. After defendants filed a motion to dismiss, plaintiffs filed the Amended Complaint.  The Amended Complaint  alleges eight counts: (1) Count I — Violation of 18 U.S.C. § 1962(c) (RICO) against Vergilis and Kalner; (2) Count II — Violation of 18 U.S.C. § 1962(d) (RICO Conspiracy) against Vergilis and Kalner; (3) Count III — Breach Of Contract against SCAS and Vergilis; (4) Count IV

---

[6]

     *Id.* ¶¶ 130–48.

[7]

     *Id.* ¶¶ 524–26.

[8]

     *Id.* ¶ 521.

[9]

     *Id.* ¶¶ 561–64.

[10]

     *Id.* ¶ 609.

4

— Breach Of Contract against Vergilis; (5) Count V — Breach of Fiduciary Duty againt Vergilis;

(6) Count VI — Breach of Fiduciary Duty against Kalner; (7) Count VII — Civil Conspiracy against

Vergilis and Kalner; and (8) Count VIII — Declaratory Judgment against Vergilis and SCAS.[11]


### Discussion

### I.    RICO Claims

### A.    Legal Standard

Section 1962(c) of the RICO statute provides that it is "unlawful for any person

employed by or associated with any enterprise engaged in . . . interstate or foreign commerce[] to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity . . . ."[12] To state a RICO claim , a plaintiff therefore must allege: "(1)

that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of

'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates

in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."[13]

In addition, to state a RICO cause of action, "a plaintiff must plead, at a minimum,

'(1) the defendant's violation of [§ ]1962, (2) an injury to the plaintiff's business or property, and (3)

causation of the injury by the defendant's violation. This third requirement is satisfied if the

---

[11]      *Id.* ¶¶ 645–92.

[12]      18 U.S.C. § 1962(c).

[13]      *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983).

5

defendant's injurious conduct is both the factual and the proximate cause of the injury alleged.'"[14] The Second Circuit has held that "it is inappropriate to apply a zone-of-interests test independent of [the] proximate cause analysis."[15]

### B.    Causation

#### 1.    Legal Standard

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."[16]   "[A] plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover."[17] "A 'plaintiff must prove only . . . an injury directly resulting from some or all of the activities comprising the violation,' however, and need not prove that every predicate act constituting the pattern injured the plaintiff in some way."[18]   Furthermore, a RICO cause of action "extends to all directly injured parties, not just

---

14

      *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003) (alteration in original) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003)).

15

      *Id.* at 373; *cf. Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir.2000) (applying separate zone of interests test); *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1258 (7th Cir.1995) (same).

16

      *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

17

      *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268–69 (1992).

18

      *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 601 (S.D.N.Y. 2014) (alteration in original) (quoting *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir. 1987)).

the most directly injured among them."[19]

"[F]oreseeability and intention have little to no import for RICO's proximate cause test."[20]  The Second Circuit "used to place great weight on foreseeability and intent in [its] RICO proximate cause jurisprudence."[21]  However, in light of the Supreme Court's decision in *Anza v. Ideal Steel Supply Corp.*[22] — in which the Court did not mention foreseeability or intent — the Second Circuit no longer places much if any weight on these factors.

Decisions from the Supreme Court and Second Circuit offer useful guidance on the distinction between direct and indirect injuries.  Cases involving injuries that were too indirect to support a RICO cause of action include:

- *Holmes v. Securities Investor Protection Corp.*[23] — Defendant and others allegedly conspired in a fraudulent stock manipulation scheme that disabled broker-dealers from meeting obligations to customers, and plaintiff was obligated by statute to reimburse the customers.

- *Anza v. Ideal Steel Supply Corp.*[24] — Defendants allegedly failed to collect New

---

[19]    *Baisch*, 346 F.3d at 374.

[20]    *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 145 (2d Cir. 2018).

[21]    *Id.*; *see Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 257 (2d Cir. 2004); *Baisch*, 346 F.3d at 373–74.

[22]    547 U.S. 451 (2006).

[23]    503 U.S. 258 (1992).

[24]    547 U.S. 451 (2006).

York sales tax from cash paying customers, allowing defendants to charge less and attract more customers than plaintiff, defendants' principal competitor.

- *Hemi Group, LLC v. City of New York*[25] — Defendant cigarette retailer allegedly failed to provide customer information to New York State as required by law, making it more difficult for plaintiff, New York City, to collect tax revenue from defendant's customers.

- *Empire Merchants, LLC v. Reliable Churchill LLLP*[26] — Defendants allegedly participated in a liquor smuggling scheme, causing liquor retailers to purchase less liquor from plaintiff-distributor.

Examples of injuries that were sufficiently direct to support a RICO cause of action include:[27]

- *Bridge v. Phoenix Bond & Indemnity Co.*[28] — Defendant allegedly lied to Cook County, Illinois, about the identity of its agents in violation of the county's rules

---

[25]

559 U.S. 1 (2010).

[26]

902 F.3d 132 (2d Cir. 2018).

[27]

In *Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003), the Second Circuit held that the injuries alleged were sufficiently direct to support a RICO cause of action. That case predated *Anza* and *Hemi Group* — both of which overturned decisions of the Second Circuit — and incorporated the foreseeability and intention elements later repudiated in *Empire Merchants*, 902 F.3d at 145. Accordingly, it is not evident that the causation holding in *Baisch* — that defendants' defrauding of Nassau County was a direct and proximate cause of the injury to a lender who advanced payments to defendants in the amounts that defendants expected to receive from the County — remains good law. *See also id.* at 141–46 (no mention of *Baisch* in proximate cause analysis).

[28]

553 U.S. 639 (2008).

8

limiting bidders for tax liens from submitting multiple simultaneous bids, causing plaintiffs (losing bidders) to obtain fewer liens.

- *Alix v. McKinsey & Co.*[29] — Defendants allegedly secured lucrative consulting assignments by lying to the Bankruptcy Court about their conflicts of interest, causing plaintiff to lose out on engagements it otherwise would have secured.

### 2.    *Application of Causation Legal Standard to Plaintiffs' Claims*

The Amended Complaint alleges that SCAS was an unlawful RICO enterprise[30] and that Vergilis and Kalner committed thousands of predicate acts of wire fraud by overbilling patients and insurers.[31] The Amended Complaint further alleges that Vergilis and Kalner provided plaintiffs with SCAS financial information that included fraudulently obtained revenues and profits. That information was used to determine the purchase price for SCAS's assets[32] — a multiplier of approximately eight times $3.3 million, SCAS's adjusted net income from June 2021 to June 2022.[33]

Defendants argue that plaintiffs do not have a RICO cause of action[34] because their

---

[29]

    23 F.4th 196 (2d Cir. 2022).

[30]

    Am. Compl. ¶ 3.

[31]

    *Id.* ¶¶ 648–653, 658.

[32]

    *Id.* ¶¶ 517–18, 521.

[33]

    *Id.* ¶ 521.

[34]

    Although the Second Circuit previously conducted this analysis under the label of "RICO standing," *Lerner*, 318 F.3d at 126, "[t]he Supreme Court has recently clarified, however, that what has been called 'statutory standing' in fact is not a standing issue, but simply a

9

alleged damages were not proximately caused by the alleged RICO activity.  Defendants contend that

insurers and patients were injured directly by the alleged overbilling, but that plaintiffs' injury —

paying an inflated amount for SCAS's assets — was indirect because it was contingent on the

decision of insurers and patients to pay on the overbilled claims.

   Plaintiffs counter that their injury was direct because (1) they paid money directly to

defendants as a result of the fraud, (2) the dollar amount paid by plaintiffs to purchase SCAS's assets

was different from the dollar amounts paid by other victims of the RICO scheme, and (3) all directly

injured plaintiffs may bring RICO causes of action, not just the most directly injured plaintiff.

   In *Empire Merchants*, the Second Circuit distinguished the direct injury in *Bridge*

from indirect injuries in other cases on the ground that it "*necessarily* follow[ed]" from the RICO

acts.[35]  That was the case in *Bridge* because of the zero-sum nature of the auctions at issue — any

additional purchase by defendants necessarily deprived legitimate bidders of the opportunity to

purchase property.[36]  Here, every additional dollar of fraudulently obtained income necessarily

increased the purchase price for SCAS's assets, which was calculated based on a multiple of SCAS's

adjusted net income.  This causal directness distinguishes this case from *Holmes*, *Anza*, *Hemi*, and

*Empire Merchants*.  In *Holmes*, the defrauding of broker-dealers did not necessarily cause their

liquidation, which triggered the plaintiff's statutory obligation to reimburse the broker-dealers'

---

    question of whether the particular plaintiff 'has a cause of action under the statute.'"  *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1387 (2014)).

[35]    902 F.3d at 143.

[36]    *Id.*; *see also Hemi*, 559 U.S. at 14 ("Because of the zero-sum nature of the auction, and because the county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over.").

customers.  In *Anza*, customers' choice to purchase products from plaintiff's competitor was not a necessary consequence of defendants' tax evasion.  In *Hemi*, defendant's failure to file required customer information with New York State did not necessarily cause New York City to lose out on tax revenue from those customers.  And in *Empire Merchants*, retailers' decision to purchase less liquor from plaintiff was not necessarily the result of defendants' smuggling scheme.

   The difficulties that arise from more tenuous causal chains are not present here.  In *Anza,* the Supreme Court reasoned that "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [plaintiff's] lost sales were the product of [defendant's] decreased prices," which in turn may have been driven by factors other than the predicate RICO acts.[37]  Here, no such complex assessment is required.  Plaintiffs' damages are a direct product of defendants' overbilling — there is no need to analyze, for example, other intervening factors that may cause customers to buy or not buy a given product.

   Defendants argue that plaintiffs' injury was indirect because it was contingent on the actions of third parties — insurance providers and patients — choosing to pay for the allegedly overbilled services.  The mere fact that a party's injury was contingent on the actions of third parties does not render that injury indirect.  To the contrary, the Supreme Court has recognized the existence of a RICO "'cause of action' in favor of the injured party where the defendant 'defrauds another for the purpose of causing pecuniary harm to a third person.'"[38]  In *Bridge*, the alleged injury was contingent on the county selling tax liens to the defendant.  In *Alix*, the alleged injury was contingent

---

[37]    547 U.S. at 459.

[38]    *Bridge*, 553 U.S. at 657 (quoting Restatement (Second) of Torts § 435A, Comment a).

on the Bankruptcy Court awarding consulting assignmens to the defendants. Yet in neither case did the reliance of a third party on the defendant's misrepresentations obviate the directness of the plaintiff's injury. So too here. The fact that plaintiffs' injuries were contingent on third parties paying for allegedly overbilled services does not detract from the directness of those alleged injuries.

Defendants further argue that plaintiffs' alleged injuries were not caused by RICO predicate violations. Specifically, defendants argue that plaintiffs were injured by a breach of the asset sale agreement, not the predicate acts of mail fraud allegedly perpetuated against patients and insurers. Defendants cite *Sedima, S.P.R.L. v. Imrex Co.*[39] for the proposition that "[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct," but only for those injuries caused by reason of a § 1962(c) violation.[40]

Plaintiffs' allege that they were injured directly by the predicate acts of wire fraud, not merely by defendants' alleged breach of the asset sale agreement. Moreover, plaintiffs allege that they were injured by defendants furnishing false financial information regarding SCAS in the sale process.[41] That financial information necessarily inflated the purchase price, which was calculated as a multiplier of SCAS's net income. Although plaintiffs do not have a RICO cause of action for acts done in furtherance of a RICO conspiracy that were not acts of racketeering,[42] they do have a

---

[39]
473 U.S. 479 (1985).

[40]
*Id.* at 496–97 (alteration in original) (quoting *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 747 F.2d 384, 398 (1984)).

[41]
Am. Compl. ¶¶ 494–500.

[42]
*Beck v. Prupis*, 529 U.S. 494, 495–96 (2000).

cause of action for the injuries they suffered directly as a result of the alleged predicate acts of wire fraud.  As set forth above, plaintiffs have alleged sufficiently that they suffered such an injury.

C.    *Securities Fraud Exception*

A plaintiff may not "rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."[43]  The purpose of this prohibition is "to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages."[44]

Section 10(b) of the Securities Exchange Act prohibits fraudulent conduct "in connection with the purchase or sale of any security."[45]  Whether the securities fraud exception applies therefore turns on whether the alleged RICO conduct was in connection with the purchase or sale of securities.  A transaction involves a security where it involves "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others."[46]  The parties do not dispute that the transaction at issue — the purchase of SCAS's assets — was an investment of money.  The parties do dispute the latter two elements.

---

[43]    18 U.S.C. §1964(c).

[44]    *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011).

[45]    15 U.S.C. § 78j.

[46]    *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

### 1.    *Common Enterprise*

"A common enterprise . . . can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits."[47]  "Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture. In fact, a finding of horizontal commonality requires a sharing or pooling of funds."[48]  Here, plaintiffs have not alleged and defendants do not contend that any funds were pooled.

A common enterprise may be established also by a showing of strict vertical commonality, which "requires that the fortunes of the investors by tied to the fortunes of the promoter."[49]  Plaintiffs do not allege and defendants do not contend that the SCAS asset sale tied the fortunes of plaintiffs (the investors) to those of defendants (the promoters).  At most, defendants argue that the investors' fortunes were tied to the *efforts* of the promoters.[50]  But this establishes only broad vertical commonality, which does not satisfy the common enterprise requirement.[51]

Accordingly, the sale of SCAS's assets was not a securities transaction because it did

---

[47]

  *Id.*

[48]

  *Id.* (quoting *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir.1984)).

[49]

  *Id.* at 88; *see also Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 435 (S.D.N.Y. 2023) (citing cases) (strict vertical commonality a proper basis for establishing a common enterprise).

[50]

  Dkt 32-4 at 20 (asserting that the individual defendants serviced and managed the acquired business for plaintiffs' benefit and profit).

[51]

  *Revak*, 18 F.3d at 88.

14

not involve a common enterprise.

### 2.    *Profits Derived Solely from the Efforts of Others*

An investor does not derive profits solely from the efforts of others — and therefore is not transacting securities — where it retains "important elements of control."[52]    Here, the Amended Complaint alleges that plaintiffs actively managed the assets they purchased, for example by entering into employment agreements with medical staff.[53]    Defendants do not contest meaningfully plaintiffs' involvement in the active management of the purchased assets.

Accordingly, the sale of SCAS's assets was not a securities transaction for the additional reason that profits from the investment were not derived solely from the efforts of others.

### 3.    *Transfer of Forefront Holdings Membership Units*

Defendants further argue that "[p]laintiffs conveyed [Forefront Holdings] membership interests as a core element of the consideration in connection with the Agreement's transaction, rendering it a securities transaction."[54]    In *D'Addario v. D'Addario*,[55] the Second Circuit held that "for a claim to be barred [by the securities fraud exception], the fraud must be 'in the purchase or sale of securities,' which means that the actual purchase or sale of securities was fraudulent; it is not

---

[52]      *Endico v. Fonte*, 485 F. Supp. 2d 411, 414 (S.D.N.Y. 2007).

[53]      Am. Compl. ¶¶ 553–56.

[54]      Dkt 32-4 at 19.

[55]      75 F.4th 86 (2d Cir. 2023).

enough for securities to be an incidental feature of an overall scheme."[56]  The court distinguished between a fraud claim against a stockbroker for misappropriating client assets — in which the securities transaction is a necessary feature of the fraud and therefore barred by the securities fraud exception — and the case before it, in which executors of an estate allegedly converted assets, including securities, to their own uses.[57]

Here, the securities at issue — the membership units in Forefront Holdings — were incidental to the fraud.  The underlying fraud — the overbilling for medical services and provision of false financial information — had nothing to do with securities.  The sale of SCAS's assets involved securities to the extent that they formed part of the consideration in exchange for the SCAS assets, in addition to the $19,670,000 million in cash paid by plaintiffs.[58]  This fact did not render securities *necessary* to the transaction.  At most, the securities were an incidental feature of the asset sale, which is insufficient to fall within the securities fraud exception.

.

D.    RICO Conspiracy

As another court in this District explained in *Angermeir v. Cohen*:[59]

To establish a RICO conspiracy, a plaintiff must plead that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity.

---

[56]

Id. at 93 (quoting 18 U.S.C. § 1964(c)).

[57]

Id. at 95–96.

[58]

Am. Compl. ¶ 526.  The value of the securities in the transaction was $5,000,000, or approximately 20% of the total consideration paid.

[59]

14 F. Supp. 3d 134 (S.D.N.Y. 2014).

In doing so, a defendant need not agree specifically to commit at least two predicate acts; instead, a defendant may violate § 1962(d) if he or she commits at least two acts of racketeering activity and knew about and agreed to facilitate the scheme. Therefore, Plaintiffs must allege some factual basis for a finding of a conscious agreement among the defendants. But a defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing. And the Court analyzes the Complaint's allegations of a § 1962(d) conspiracy under the more liberal pleading requirements of Rule 8(a).[60]

Here, the Amended Complaint alleges that Vergilis and Kalner agreed "to facilitate the operation of SCAS through a pattern of fraudulent charting, coding, and billing."[61] Specifically, the Amended Complaint alleges that (1) Vergilis trained SCAS practitioners to enter false entries into SCAS's Electronic Health Records system and Kalner participated in these trainings,[62] (2) Vergilis and Kalner held joint review sessions during which they made changes to bills to "upcode" or alter them to procure additional payments,[63] (3) Vergilis and Kalner submitted hundreds of false and fraudulent bills to third-party payors,[64] and (4) Vergilis and Kalner worked together to make changes to rejected bills or claims and resubmit them.[65] Defendants argue that these allegations "combine speculation and hyperbole with sparse and disparate facts to form conclusory legal

---

[60]    *Id.* at 154–55 (cleaned up) (citations omitted).

[61]    Am. Compl. ¶ 483.

[62]    *Id.* ¶ 484.

[63]    *Id.* ¶ 488.

[64]    *Id.* ¶ 490.

[65]    *Id.* ¶ 491.

17

statements that fail to establish a factual predicate for conspiracy."[66]

The foregoing allegations are sufficient to state a RICO conspiracy claim against Vergilis and Kalner.  First, these allegations set forth acts of racketeering activity (*i.e.*, wire fraud) that each defendant agreed to commit.  Second, these allegations go beyond "mere knowledge of a scheme . . . coupled with personal benefit," which "is not enough to impose liability for a RICO conspiracy."[67]  Rather, they provide a factual basis for a finding of conscious agreement between Vergilis and Kalner to facilitate the fraudulent overbilling scheme.

## II.    State Law Claims

### A.    Breach of Fiduciary Duty Claims (Counts V and VI)

#### 1.    Duplicativeness

Defendants argue that the fiduciary duty claim against Vergilis is duplicative of the breach of contract claim against her.  Under New York law, "a cause of action alleging breach of fiduciary duty which is based on the same facts and seeks identical damages is duplicative of a breach of contract cause of action and should be dismissed on that basis."[68]  "Even if a cause of action concerns some of the same underlying conduct as the breach of contract cause of action, if the allegations concern a breach of a duty that is independent of the contract, they are not subject to

---

[66]

       Dkt 34 at 6 n.8.

[67]

       *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 439 (S.D.N.Y. 2019) (quoting *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001)).

[68]

       *Bd. of Managers of Brightwater Towers Condo. v. FirstService Residential New York, Inc.*, 193 A.D.3d 672, 675 (2d Dep't 2021).

dismissal as duplicative."[69]

Here, the Amended Complaint alleges that fiduciary duties of loyalty, care, and good faith Vergilis owed to her employer, Forefront East, "were separate and unique from the duties that arose under her Employment Agreement."[70]  Plaintiffs  further  argue  that  the  claims  are  not duplicative because they do not seek the same damages because it seeks the return of her employment compensation, and punitive damages.[71]

Defendants cite the Second Circuit's ruling in *Carco Group, Inc. v. Maconachy*[72] that faithless servant claims (discussed in greater detail below) are contract claims, which suggests that the return of the money paid to Vergilis would be recoverable via the breach of contract claim. Defendants further argue that the Amended Complaint does not support a punitive damages request under the breach of fiduciary duty claim.

The Court declines, at this stage, to dismiss the breach of fiduciary duty claim against Vergilis as duplicative.  With the benefit of discovery, the parties may brief at the summary judgment stage whether and to what extent this claim is duplicative of the breach of contract claim against Vergilis.

---

[69]

    *Id.* at 674–75.

[70]

    Am. Compl. ¶ 600.

[71]

    *Id.* ¶¶ 675–76

[72]

    718 F.3d 72 (2d Cir. 2013)

###### 2.    *Causation and Damages*

Defendants argue that plaintiffs fail to allege that they suffered damages caused by the alleged breaches of fiduciary duty by Vergilis and Kalner.  Plaintiffs counter that the breaches of fiduciary duty caused them (1) to pay Vergilis and Kalner wrongfully during a time in which they allegedly breached their fiduciary duties to plaintiffs, and (2) consequential damages.[73]

Plaintiffs rely on the faithless servant doctrine to obtain return of the funds paid to Vergilis and Kalner.  "The faithless servant doctrine provides that an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties."[74]  Plaintiffs' theory appears to be that Vergilis and Kalner were disloyal to plaintiffs because their misconduct enriched them while exposing plaintiffs, or assets owned by plaintiffs, to legal liability.

Although the faithless servant doctrine may apply even where an agent's services were beneficial to the principal, plaintiffs still must identify "repeated acts of disloyal conduct" to prevail on such a claim.[75]  The pattern of racketeering activity predated plaintiffs' acquisition of SCAS's assets, before which Vergilis owned those assets.[76]  According to plaintiffs' theory, Vergilis was disloyal to SCAS at the time she owned SCAS's assets, undermining the argument that

---

[73]

    *Id.* ¶¶ 676, 681.

[74]

    *Robinson v. De Niro*, 739 F. Supp. 3d 33, 126 (S.D.N.Y. 2023) (cleaned up) (quoting *Sanders v. Madison Square Garden, L.P.*, 2007 WL 1933933, at *3 (S.D.N.Y. July 2, 2007)).

[75]

    *Kleeberg v. Eber*, 665 F. Supp. 3d 543, 574 (S.D.N.Y. 2023).

[76]

    Dkt 30-1 at 2, 5 (providing that Vergilis was the sole owner, officer, and director of SCAS at the time of the asset sale).

Vergilis's post-acquisition conduct was disloyal.

Setting aside the faithless servant damages, plaintiffs claim that they are entitled to (1) consequential damages in the amount paid back to Medicare as a result of Vergilis's breach of fiduciary duty, and (2) unspecified consequential damages arising from Kalner's breach of fiduciary duty.[77]  Defendants zero in on the allegation Kalner attempted to embezzle funds, which did not cause any injury because no funds were embezzled.[78]  Plaintiffs counter that they are not relying on the attempted embezzlement to establish damages, but instead are seeking consequential damages and money returned to Medicare.[79]  Defendants do not rebut this assertion in reply.

At this stage, the Court declines to dismiss the breach of fiduciary duty claims because the facts alleged are reasonably susceptible to the inferences that (1) defendants' conduct was inconsistent with their agency relationship to plaintiffs, and (2) plaintiffs suffered additional damages.  At summary judgment, plaintiffs will need to demonstrate at least a genuine issue of material fact as to their entitlement to faithless servant damages and/or other damages caused by the alleged breaches of fiduciary duty.

B.    *Civil Conspiracy Claim (Count VII)*

Defendants argue that plaintiffs' civil conspiracy claim should be dismissed because "New York does not recognize an independent cause of action for conspiracy to commit a civil

---

[77]

Am. Compl. ¶¶ 676, 681.

[78]

Dkt 32-4 at 25–26.

[79]

Dkt 33 at 29.

21

tort."[80]  Plaintiffs counter that  "civil conspiracy is a claim recognized at New York common law as long as there is an underlying (tort) offense."[81]

      As set forth above, plaintiffs Forefront Management and Forefront East have alleged claims for breach of fiduciary duty.  Dismissal of their civil conspiracy claims therefore is not warranted at this stage.  Plaintiff Forefront Holdings has not brought any underlying tort claim. Accordingly, dismissal of Forefront Holdings's civil conspiracy claim is warranted because it has not alleged that it was injured by an underlying tort offense.

### C.    *Declaratory Judgment Claim (Count VIII)*

      The Amended Complaint seeks a declaratory judgment that plaintiff Forefront Holdings's cancellation of the membership units transferred to SCAS in the asset sale was proper and valid.  Defendants argue that this claim is duplicative of Claim III — against SCAS and Vergilis for breach of the asset purchase agreement — and therefore should be dismissed.  Plaintiffs counter that the claims are not duplicative because Claim III is brought by Forefront Management and Forefront East, while the declaratory judgment claim is brought by Forefront Holdings.

      The Court possesses "broad discretion" not to entertain an action for declaratory relief.[82]  The factors pertinent to this exercise of discretion are "(1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such

---

[80]

    *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (1st Dep't 2010)).

[81]

    *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 445 (S.D.N.Y. 2022) (citing  *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (1st Dep't 2010)).

[82]

    *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction."[83]

These factors weigh against entertaining the declaratory judgment claim. Forefront Holdings is a party to the asset purchase agreement[84] and can seek remedies against defendants for breach of contract. Regardless of whether the Amended Complaint contains such a claim, the availability of this adequate alternative coercive remedy weighs against entertaining the declaratory judgment claim. Moreover, plaintiffs have not identified any useful purpose that a declaratory judgment would serve separate and apart from resolution of plaintiffs' other claims.

Accordingly, Count VIII is dismissed.

D.    *Punitive Damages*

Plaintiffs seek punitive damages in Counts V, VI, and VII. Defendants argue that the requests for punitive damages should be stricken because plaintiffs have not alleged "circumstances

---

[83]    *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99–100 (2d Cir. 2023) (cleaned up) (citations omitted).

[84]    *See* Dkt 30-1 at 2.

of aggravation or outrage, or a fraudulent or evil motive on the part of the defendant."[85]  Plaintiffs counter that resolution of this question is inappropriate at this stage and that the facts alleged in the Amended Complaint are sufficient to support a punitive damages award.

"[M]otions to dismiss may be directed at prayers for relief where particular damages are unavailable as a matter of law."[86]  Here, defendants do not challenge the availability of punitive damages as a matter of law.  Although the Court could treat this aspect of defendants' motion as a motion to strike,[87] the facts alleged here, if established, would demonstrate a "high degree of moral culpability" that could potentially support a punitive damages award.[88]

---

[85]
    Dkt 32-4 at 28 (quoting *Emmet & Co. v. Catholic Health E.*, 49 Misc.3d 1058, 1074 (Sup. Ct. N.Y. Co. 2015)).

[86]
    *OL USA LLC v. Maersk A/S*, 730 F. Supp. 3d 66, 73 (S.D.N.Y. 2024).

[87]
    *See Doe v. Indyke*, 457 F. Supp. 3d 278, 283–85 (S.D.N.Y. 2020).

[88]
    *See Stein v. McDowell*, 905 N.Y.S.2d 242, 245 (2d Dep't 2010).

24

*Conclusion*

Defendants' motion to dismiss (Dkt 32) is granted to extent that plaintiff Forefront Physicians Holdings, LLC's claims for civil conspiracy (Count VII) and a declaratory judgment (Count VIII) are dismissed.  It is denied in all other respects.

SO ORDERED.

Dated:        April 24, 2025

_____
Lewis A. Kaplan
United States District Judge